Welcome this afternoon we have In Ray LTL Management, LC Numbers 22 dash 2003 2004 2005 2006 2007 2008 2009 2010 and 2011 and In connection with the Or I'm gonna say I had told council previously that we would probably go a bit longer than the two hours That said once upon a time. We had an oral argument. We started in the morning and a case called combustion engineering and it we went from about 930 to about 535 45 And I didn't realize we didn't I was reminded years later that we only took two 15-minute breaks Which was not fair I Seth Waxman argued and he told me that and somebody was with him at the time No, judge Craig Goldblatt said that is exactly right and I didn't realize that. Mr. Waxman doesn't eat on the day of oral argument And so in the afternoon, one of my law clerks was feeling a little faint went and got some M&Ms And she's sitting over there and she looks at mr. Waxman and mr. Waxman looks at her and they both go Open their hands and each had M&Ms in their hand So I've learned my lesson what we will do is We will not go past five o'clock today and we will take a break after the first hour or so so that Everybody can get some time to regroup and also if somebody wishes to have a break Sooner than that. Just give me a little bit of a high sign. We'll go from there and with that Why don't we begin? With mr. Lampkin And I've promised the mr. Lampkin and mr. You come on up mr Koch all that similar to what the Supreme Court has been doing the last few years We'll have two minutes of uninterrupted time at the beginning of your argument Thank you. Your honor may it please the court if I may reserve 15 minutes for a bottle you sir For more than a century companies facing genuine financial distress have done what companies like John's man built did They submit themselves and their assets to the bankruptcy court and to the codes requirements and creditor protections This is an effort to do the opposite in LTL's words to put talc related claims through the chapter 11 reorganization without subjecting the rest of the assets of JJCI to bankruptcy procedure and to enjoin suits against 670 non debtors including affiliates even though they have independent non-derivative liability That subverts at least three four different core bankruptcy principles First if J&J or JJCI had declared bankruptcy priority rules would require creditors to be paid in full Before equity gets anything but here J&J and JJCI operate outside bankruptcy with old JJCI's assets Paying billions in dividends to equity equity to shareholders Last week J&J announced a five billion dollar stock buyback more for equity But talc victims alone are mired in bankruptcy as they die All JJCI trade creditors are compensated in the ordinary course but the disfavored creditors talc victims sit languishing in bankruptcy a Clear subversion of the priority rules that ordinarily apply is hard to imagine Second debtors in possession management ordinarily have a powerful incentive to try and emerge from bankruptcy as quickly as possible So they can get on with their ordinary operations free from bankruptcy supervision But here J&J and JJCI the tort fees are funding all this have no such interest in swift Emergence, they operate all JJC's assets outside of the bankruptcy code free and clear of bankruptcy court supervision Paying who they want while talc claimants alone aren't bankruptcy LGL has no incentive. It exists only for bankruptcy. No operating business No transactions to engage in You need only look at the three other two-step bankruptcies to understand exactly what happens with incentives before bankruptcy For example best while had resolved 15,000 asbestos claims Now five years in not one claimant has received compensation from bankruptcy We have no approved plan and all the official committee representatives alive at the cases asset outset have passed away worse the delay benefits LTL and JJCI and Johnson & Johnson As talc victims can only get more desperate They can only get more likely to cave each day. They face unreimbursed medical expenses and they get closer to their own deaths Is your principal argument that there is not a proper bankruptcy purpose? or that The debtor here is not in financial distress or what? so the answer is it's not a proper bankruptcy purpose because evading the bankruptcy code principles is not a valid bankruptcy principle as this court pointed out in SGL those who seek relief in bankruptcy have to comport with the Underlying bankruptcy code principles and when the bankruptcy is established for the very purpose of evading the ordinary bankruptcy procedures And by the ordinary bankruptcy code principles, you mean what or I mean, for example what I started out with which is the priority rules This is this is structured so that all of the dividend all the dividends all the equity can be paid Well one category of claimants tell creditors sit in bankruptcy and don't get paid Another principle is that you have to have incentives to come to the bankruptcy to come forth a reasonable plan in order to emerge Swiftly, but the opposite is true when you take all the operating assets all the businesses and you can operate them outside bankruptcy And the only people who are mired in bankruptcy are the talc claimants. You're referring to economic relief for the victims Yes. Yeah, that's exactly right. And the ordinary principle is under the absolute priority rule The ordinary rule is no equity gets paid until clay until creditors are paid and we have the exact opposite going on How is that economic relief? Appropriated. I'm sorry. Your honor is that economic relief delivery to the victims? So ordinary in the ordinary tort system that the victims bring their lawsuits and they either settle or they go to trial and they get relief but they're allowed to proceed and try and seek that compensation through the system that 50 states have used for two centuries to compensate victims of misconduct But right now you're saying bankruptcy does not allow that Well bankruptcy delays it While we're going through all the plans and trying to come up with it and right now if you look at how it works When you have these two-step bankruptcies It goes for for a best fall five years with nobody getting compensated No plan and everybody dying in the meantime By contrast if you go if you don't separate it people have if you don't separate your liabilities and put them off into one entity an artificial entity with just these tough liabilities and you instead have Your liability people with liabilities and the actual companies in bankruptcy Then there's an incentive to go forward and come up with a plan So people actually get compensated and get compensated promptly because management wants to emerge from bankruptcy But right now there's no incentive actually to do that for J&J and JJCI because they're operating all JJCI's assets Famous brands of you know, Tylenol and the like free and clear of bankruptcies off requirements Instead the only ones who are sitting bankruptcy are the TAL claimants. They pay their ordinary trade creditors No problem pay them as they as money comes due only the TAL claimants sit in bankruptcy It's just in that sense like SGL where you've just taken one set of creditors and put them at a disadvantage TALC victims and everybody else proceeds as before. If LTL were formed in 1979 to hold the TALC products So instead of going to baby products, it goes to LTL And LTL operated for a number of years, but now is in the process of doing in effect an orderly liquidation But you have a problem So I think that are the issue we have in terms of this Evading the structure of the bankruptcy code and all the principles of bankruptcy code That would be a very difficult argument to make because once you take an entity and you operate it and you have a legitimate business Purpose for the structure that the entity has you're operating it for a number of years Then that's a legitimate non-bankruptcy purpose We've crossed the line is where two days before you declare bankruptcy You do a divisive merger in order to put the top payments into bankruptcy alone and take the assets the operating businesses the valuable brands of that former company and put them outside bankruptcy and it's solely for the purpose to Ensure that TALC claimants are treated one way and all the assets are outside the bankruptcy when you do that Two days before bankruptcy. I think that clearly crosses a lot. It sounds from what you're saying is You're saying it'll be a different argument It sounds like if they had done that in 79 and ran the company for a number of years ultimately decide they couldn't go forward Do a liquidating 11. It would be acceptable an acceptable bankruptcy purpose in that particular Circumstance, is that correct? so I would not be able to argue today that this is an evasion of bankruptcy purposes because Clearly it was done for a purpose not of evading bankruptcy It was done because that was a logical way to operate the business in 1979 It was operated. So and then you're saying at the other end of the spectrum what they did by forming on October 12 2021 filing two days later It doesn't work when where is the line that is crossed in your view? So I think the line is when the sole purpose is not a legitimate business purpose So this is a logical way to operate the company But the sole purpose is to disrupt to subvert to frankly pervert the bankruptcy code To evade its ordinary principles. I think that crosses the line What do we make of the timing here? And what I mean by the timing is as I understand it about four months after the Supreme Court denied certain Ingram LTLs formed and shortly thereafter the day after the Default for bankruptcy shortly thereafter. What do you make of the timing here? So your honor, I think it was the timing is clear that they in essence J&J had felt failed and they said this we felt failed by the tort system And so they went to another system. They thought would be more favorable. They went to bankruptcy but the problem is You they want to evade the tort system and move to bankruptcy if they have financial distress and I know that's disputed that they have a village in that purposes That's fine but they also don't want to actually face the usual bankruptcy rules because rather than just saying taking we have a distressed work user JJC I or J&J and we will put it into bankruptcy, which is the ordinary way of doing it That's how it was done in John's Mandel. That's how it's been done for 200 100 years since we've had something like a chapter 11 Rather than do that. They did something fancy and they said we're going to take the top claimants alone They're going to go into bankruptcy by themselves and they're the only creditors that will be stuck in bankruptcy the assets these businesses that are Producing valuable goods with famous names. Those are going to stay outside bankruptcy and that's some first everything that banks resist a bit do In fact, there's if I go to the third point You know the usual rule of bankruptcy is the bankruptcy court has supervision over the debtors Operations to make sure those operations are working for credit or benefit to enforce fiduciary duties towards the creditors But if you look at appendix page four four six three J&J has now announced. It's actually in a spin-off. It's consumer products division effectively is being off JJC I Now if J&J or JJC I had declared bankruptcy the bankruptcy court under section 1363 would had authority over that non-ordinary course Creditors like the top claimants would enable to have notice an opportunity to be heard but because they've shifted everything to a new entity and they've only put an artificial entity a Concocted made for bankruptcy entity into bankruptcy. None of those protections apply There's no ability for the bankruptcy court to look and say yes, you're spinning off JJC I Let's make sure that we put everything in escrow Let's make sure we do something to make sure that all those funds are available for the creditors who for whom? They should benefit your concern is is principally for the top victims Is that absolutely your honor and your suggestion if I'm not mistaken is to take them out of bankruptcy? Is that right to take them to take those? Talent victims out of bankruptcy. They should not be subject to the That's right Because this is not a good faith bankruptcy because the purpose of a bankruptcy by its terms is to evade their usual bankruptcy Requirements the bankruptcy should be dismissed now. There's a second question. What's a bankruptcy to avoid bankruptcy? Pardon, it's a bankruptcy to avoid bankruptcy. Is that what you're saying? This is exactly what it is It's a bankruptcy to design to avoid the purposes and principles of bankruptcy It's been gerrymandered in a sense so as to place only one class of creditors at risk You mentioned in the second question, but let me ask you if we get if we come to the conclusion This was not done in good faith. It's a bad faith file Do we need to get to the second question on the stay? No, your honor because the mandatory requirement or 1 1 12 1 1 12 B Is if it's not if there is cost the court must dismiss it says it shall just so this is not good faith The standard and only remedy is dismissal now, there is an unusual circumstances exception But there's requirements that have not been met One of them is there is good cause or a good good justification and there's simply no good justification for a bad faith bankruptcy and Second is that there has to be a cure in a reasonable period of time I think when the entire bankruptcy is structured so that health victims Are on their own in bankruptcy and all the other creditors are out bankruptcy outside bankruptcy when the structure is set up so that health Victims are bankruptcy, but all the assets are outside bankruptcy There's no cure there that someone come up with and I don't think that just the bankruptcy court ever suggested There could be a cure if you if you were in the shoes and you call it old JJC I probably just called for this sake of people here in the audience old consumer So your Johnson & Johnson Johnson & Johnson consumer which took over baby products so let's so consumer doesn't go and he keeps the other items like you know, you know Tylenol, etc And you separate out it's like good bank bad bank back in the late 80s when you had Coming on a Friday night you separate everything out and you open the bank up on Monday In light of the verdict in the Ingham case, which I think surprised a lot of people even though it was ultimately reduced What would you have advised to do if you were? representing J&J Consumer I think my answer would be the answer that all the companies have confronted for a long time Which is if you're genuinely in financial distress You can take your company into bankruptcy If you're not genuinely bankrupt bankers in bankruptcy, excuse me in jet financial distress, then you may continue your fight Yes, you got a bad result and in income but look after Ingham What did J&J tell its investors after it was denied it said the facts were quote unique in cases not representative That's an appendix for excuse me 4404 after the non Ingham What did it tell the investors that liabilities were quote not expected to have material adverse effect on the company's financial position appendix 4506? And what did it tell the court about what did LTL tell the court? It reiterated that there was in light of the liabilities quote no likely need of the debtor to invoke the funding agreement So that's supposedly 61 billion dollars to its maximum out or anything close to it. That's appendix 3747 This is probably the first planned major bankruptcy At least the first I've ever heard of where if you're looking for indicia of financial distress You don't find any business executive You don't find any documents at J&J or JJCI before the bankruptcy thing. Wow, we're financially distressed We're heading for insolvency The first time you see that is in the bankruptcy and where's it coming from? It's coming from the lawyers when you look at financial distress. Are you looking at? Old consumer and LTL or just LTL so I think that the proper answer is since we since we're if we indulge the facade that LTL is a legitimate entity to put into bankruptcy and Mind you had to read it was just a tad when you pardon ratio for it's just the Ted So yeah, so if we if we indulge the notion one died wouldn't accept it It's okay to take LTL and put LTL into bankruptcy I think the answer is you have to look at LTL's liabilities because that's the chosen one the one they've chosen and you would ask Can LTL is it's suffering financial distress? In cases live live by the live by the LTL died by the LTL. They've chosen to designate something LTL Claim it's a separate entity push into bankruptcy with just the talc victim claimants Well, then you're looking for financial distress. You're going to just look at LTL, but you I Thought your initial concern was it the optics aren't right in Breaking off and keeping out of bankruptcy good company while putting into bankruptcy Bad company with the liabilities That's exactly right your honor. And that's why if you're going to indulge the notion, but that's the key thing doesn't that sound as if You're taking all the consumer into account it's almost like I Kept wondering why you didn't somebody didn't file like a fraudulent conveyance action So your honor, you know down the road if we're legitimately in bankruptcy There are remedies for certain individual transgressions but the fact that there are remedies down the road for individual transgressions doesn't make an otherwise bad faith bankruptcy the good faith bankruptcy to begin with Good faith is a threshold requirement at the outset when the entire structure of your bankruptcy is designed to evade traditional bankruptcy requirements traditional priority rules Supervision over spinoffs all the things that courts do to make sure that the money is there for creditors when it's designed to do that Well, it's just not a good faith bankruptcy. You don't even get to something like a project I think about the financial distress and litigation from it opposing counsel makes much of the fact that there are 38,000 plus Claims being filed or have it have been filed and more common with respect to the tack litigation Can fear or the the cost of this litigation? Qualifies financial distress. So your honor, I don't think the supposed efficiency of bankruptcy counts I think the court has said in cases like SGL that that isn't thinking that you're going to be more efficient in bankruptcy Doesn't count but even so that still doesn't tell you whether or not it's much more efficient But less exposure is the exposure the same Yeah, so I think your honor the notion that if one is going to be in financial distress That is the threshold you need immediate financial distress the notion that you can just reduce your out your liabilities from yay to lower Isn't a sufficient basis. And so the real question is looking at LTL or if you want to indulge fiction and go back to JJC I as the bankruptcy court do was there legitimate financial distress that they were not going to be able to make their payment that they Really have a need to go into bankruptcy, which is powerful medicine People's don't get paid cases 40,000 cases around the country get stayed that's powerful medicine You have to have some significant showing there and we don't think they got there But even apart from it if there is financial distress that just reinforces my first point Which is if there's financial distress, that's all the more reason you want the traditional bankruptcy protections to be in place If there's financial distress, you don't want money like what you're saying You want the traditional bankruptcy protections to be in place for old consumer? Exactly exactly because if old consumer and you know as LTL is telling us, you know Even you just said that you're looking primarily at LTL in connection with this case and all consumers kind of off to the side So we would for financial distress look to LTL. But remember what is supposedly funding this bankruptcy? It's an unsecured Funding agreement backed by J&J and JJC. I so if they face legitimate financial distress There's every reason to be worried about not supervising what they're doing every reason to believe that they shouldn't be paying equity Ahead of crud injured talc victims But if you're a claimant isn't the only thing you're really concerned with is that they pay up if they as to what they say They'll pay up for no, your honor. I think who gets paid first is critically important If I am left waiting my turn as people are passing away That's very different than the absolute priority world where equity doesn't get paid until I'm paid first That's a hugely different endeavor. It's entirely different in terms of the incentives as I pointed out Why is J&J and J&J CI going to push this through bankruptcy if they can continue paying equity if they can spin off divisions without? Bankruptcy court supervision if they continue their operations just as before Then there's no reason for them to push this through and LTL has no reason to push this forward and have a reasonable plan because They're made for bankruptcy. They have no assets. No operation. So you're saying is through the back door equity is coming out whole Whereas if it had been old consumer in bankruptcy The absolute priority rule would have played out differently It may well be your honor But we don't have to guess at an answer because the rules are there to make sure that happens And we don't just and we don't set aside the rules and say well We're gonna play this monkey business with the absolute priority rule and allow this Elaborate scheme where you carry one set of claimants out because it might work out in the end There's no sort of it might work out in the end exceptions The absolute priority rule where you get to pay equity as you go and certainly not without consent Certainly not without a bankruptcy court supervising what's going on. That's what we count on the bankruptcy court So what's your thought about individuals who may be exposed? But the exposure is is it's not really realized until you years years down the road, right? And so look first, you know If we're worried about the interests of future claimants Future claimants would be as much protected by a JJCI bankruptcy as an LTL bankruptcy that just simply doesn't answer whether or not you should take this concocted made-for-bankruptcy entity and Put it in bankruptcy with just the telco late claimants alone If bankruptcy serves Is that all these cases should be out of bankruptcy? Pardon, your suggestion is that all of these cases should be out of bankruptcy. That's exactly right Everybody should be treated the same either all the creditors are in bankruptcy or all the creditors are out Either all the assets are in bankruptcy or all the assets are out of bankruptcy and that's for future money I assume that would protect people who were exposed years down the road there would it would not be subject to bankruptcy, of course But they would be protected Yes They would have their claims as they come up and as they realize they're in they're injured and look this is not the first Mass tort that has something of a tail to it where people end up getting sick over time later at later in time There's lots of mass torts like that. There is Vioxx for Merck There's a diet drugs litigation These things happen and the tort system has ways of handling them If there is other reasons and legitimate basis for going into bankruptcy Well bankruptcy has ways of handling it too But concern for future claimants is not itself a reason for bankruptcy and it's a little bit of an irony here that we have Johnson And Johnson asserting that it's concerned about future claimants when its position in this litigation is that there was no asbestos No one was injured This is just a matter of a litigation lottery and no one should receive anything Really you're interested in top and the interest of top claimants listen to the top claimants there's just not one here telling you that they'd rather be in bankruptcy that they really don't want to be in this the Tort system that 50 states have used for nearly two hundred so we find that Come to the conclusion that it was a good faith filing. What do we do with the state? Did the bankruptcy court exceed its jurisdiction? So I think the bankruptcy court did exceed its jurisdiction because even if one assumes the LTL a proper debtor And that's our debtor that has consequences and that means when you're looking at 362 and an automatic stay that applies to the debtor What the bankruptcy court did here is it stayed over? 670 actions against over 670 non debtors including debtors that have their own independent own tortious conduct Non-derivative liability and that just exceeds its jurisdiction to get there the district court Excuse me. The bankruptcy court looked at two things that set talked about mostly supposedly shared insurance and indemnification agreements But the key finding on that is on appendix 159 where the court accepts that I'm quoting that any claim of shared identities of interest Is based solely on the allocation of agreements to the debtor on the eve of bankruptcy Here's the cure part for the very purpose of extending the stay The court in essence said look even though the purpose of this indemnification agreement reallocated to LTL Even though the purpose of having shared insurance was to extend the stay That's a good enough reason to give a stay to companies like Johnson & Johnson that have their own tortious conduct And that's just error twice over combustion engineering makes it very clear that agree contrived agreements for purposes of creating jurisdiction just can't be given that type of way because otherwise Jurisdiction can be created by consent. What's the usual way that you would argue that there is jurisdiction for non debtors Or a stay that would have of the 362 that would affect on debtors, correct? So the usual way you would find that is if you found something that's akin to an identity of interest where if there's liability by the non debtor that is Automatic liability for the debtor and no ability of the bankruptcy court to intervene and say yes I know that non debtor is liable, but it's not I'm not going to let it dissipate the assets of the debtor And in that context is it core jurisdiction or is it related or is it? By virtue of a rising under or rising in or is it related to jurisdiction? So I think the better answer is to adhere to the text of the statute which says only the debtor for 362a1 actions against the debtor literally We know what courts tend to do practically speaking They tend to use 105 and they say we're going to extend it because there is this quote identity of interest close quote Or there is insurance that's being paid out for the non debtor that would likely be also covered Covering the debtor itself. Therefore, you don't want to dissipate the insurance. So therefore you put in a 362 a3 and we're going to combine the two a 1 a3 along with 105 and go from there and it looks like a lot of courts just tend to Deal with it practically. I was just looking for some cases and we found that one by Judge Posner on the Seventh Circuit, you know, it's just No wasn't all that much analysis. It's just it's the right thing to do yeah, and I think the the right thing to do theory really is relying on a 105 because 105 is sort of a nest the necessary and proper clause that says well, it's necessary and proper But 105 doesn't create its own jurisdiction You have to go find jurisdiction under another provision of the bankruptcy code and the problem with 105 is Here in particular is you'd have to have the necessary findings and other in order to Invoke it and the findings just are absent. For example for indemnification the ordinary rules. It has to be automatic indemnification If you need another lawsuit for the indemnification to occur as an under federal mogul MW grace if you need another lawsuit Then it doesn't count for 105 because the bankruptcy court can intervene when that other lawsuit is filed against the debtor And there's simply no finding and I think LTL concedes this on page 96 But there's the LTL would certainly face quote automatic indemnity obligations. So it just falls short under WR grace and under federal mogul and second even apart from the fact that we these are all either the bankruptcy indemnifications for the purpose of establishing jurisdiction the 1979 JJJ CI agreement That can't really establish even for old JJCI and indemnity obligation because that covers only liabilities that are Allocated are allocated on the books or records of J&J as pertaining to its baby division but there were no type liabilities in 1979 allocated to Old JJCI at that point and it doesn't really expressly indemnify J&J for its own tortious Misconduct you typically have to have language regarding fault negligence culpability something like that in there There's no language like that in the 1979 agreement. Finally. I see my red light is not fine. You're on our time I'd like to go into What the benefits and detriments are in? considering a 524 G Channeling injunction or trust if you will Versus the mass tort system because we've had a lot of amicus Or amici file briefed one way or the other. I mean the theme seems to be of the debtor that The 524 G trust can be set up. It's adequately funded along with claims coordinator already in place claims coordinator has a proven track record of Veriting out valid claim from invalid claims and you can do estimations and Everything can be resolved in one single venue and therefore the point is what's wrong with that? So first, I think you don't get to a remedy like 524 G Until you have a legitimate good-faith bankruptcy in the first place And so that would not solve our problem with the lack of good faith. The fact that we've hived off one set of creditors Talk victims for differential treatment the fact that we've taken the actual assets of the entity and put them outside bankruptcy But one of the problems here is that 524 G has been distorted by that as well Look for a 524 G trust. The idea is you take the debtors securities and you put them in the trust With a right to dividends so that in a statute so that you have sort of that ongoing Evergreen source of funding so you can keep coming up with more assets to pay future claimants What this court in a footnote referred to or quoted Congress is saying that you have a goose that can put lay golden eggs And continuously fund those victims But what happened here is because we swapped out debtors from JJ and at somebody with an actual operating business Famous brands to somebody who's just it's made for bankruptcy entity You've swapped out a very different goose and it's a goose that doesn't lay golden eggs It just is a goose with a right to have a funding agreement It's an unsecured funding agreement subject to defenses and that's just inconsistent with combustion engineering which says on page 248 It says look implicit in this is that you need an ongoing operating business and that's reinforced by section 524 G to B because that says that you could only have a this sort of 524 G trust When your debtor was named in litigation at the time of the bankruptcy and that forecloses the idea of having That seems to be hyper literal in this case because in the end The LTL I think probably already has been named in cases has it not No, your honor. I don't think it's hyper literal in the following sense because it serves an important purpose Congress wants the real tort teaser the real guy who has an operating business to be the one Operating the 524 G trust has been his securities going to the trust by requiring somebody to have been named when they declare bankruptcy It ensures that you have a real company. They're not a made-for-bankruptcy debtor like LTL It has no real operations and it has no I was hoping we have a real company and liquidating 11s are allowed and specifically integrated telecom tells you in footnote 4 that oftentimes you have liquidating 11s and In my day, but we had quite a number that were filed in the 80s or at least in the 90s Also, you know, it's possible that if you had a consensual plan People could agree to having something like LTL be putting its securities Whatever those might look like in a 524 G trust I don't think it's consistent the statute but one can do it could conceive of it But this deprives the claimants of that opt of that choice right now The debtor that would put its securities in is LTL that's made for bankruptcy entity That doesn't have operating divisions and everything that's guaranteeing Everything that is, you know sort of pledged in some sense that you know, there's an there's an unsecured An unsecured funding agreement all those assets are now being spun off By J&J and won't even be assets. They are just funded anymore So I think it just completely upsets the whole idea of 524 G of taking the debtors actual securities So it would be the best approach a there are a lot of heartbreaking stories here And and it's very difficult to come up with a right game plan for everybody from your perspective What would be the best approach here? I think or for these very difficult cases these talc related Disabilities so I can speak from my perspective in my clients and from my perspective my clients They are happy to go forward with a traditional tort system that has operated in this country There's compensate people for 200 years, but if how long that how long would that take your honor? I don't know how long it would take but I know that these things do move very quickly For example, you know judge Rovino downstairs 186,000 talc resolutions Vioxx resolved Diet drugs resolve the tort system can handle these massive torts This is not the first but that also doesn't in the end tell you What are you going to have? Is it okay to just go have a JJCI bankruptcy or are you going to allow there to be this concocted entity? LTL with only talc victims No other creditors and all of old JJCI's assets sitting outside back, but I think that goes to a part of what judge What is is asking is which system is better the MDL system or the bankruptcy system for resolving these types of claims? In an orderly way and getting money as quickly as we can to people with dollar claims So under this structure, I can tell you there's a clear answer and it's the tort system because if you look at best when you separate the Assets and the ability to operate from the bankruptcy system when you take only the talc claims only the victims and put them alone in  Bankruptcy bogs down and you go five years without a plan without anybody getting before that Best wall has been five years. But in this case, we don't know if Bankruptcy is found to have a valid purpose here and it goes back I don't know what it's going to be over, but it does seem based on what some people have filed that MDLs take a long time and Well, perhaps you can have bellwether trials Most of what you do is Discovery you send it back to the other courts. You hope to somehow at some point you can get a settlement discussions going But that also can take many years Your honor. I Agree that no system is perfect here But we're the ones looking for compensation and we're happy to be in that system which can sometimes be slow But it can also move very quickly as the examples I gave you show but in the end I don't think courts should be in the position of saying I think bankruptcy is better because it's more efficient or I think tort is Better because it's more consistent with other values like having jury trials and individual justice I think that the answer is if you have a bankruptcy that has been structured To bypass the traditional bankruptcy protections, which is what you have here That is not a good bankruptcy if the purposes are to benefit the parent the corporate parent, which is the case here That is not a proper bankruptcy So you're in where your worldview any equities with respect to which system is better or worse shouldn't be baked into the equation I don't think that is because it comes very very close your honor to litigation advantage who thinks which system is better Is this better for the victims is this better for the plaintiff or the defendant or the the petitioner? That's just not someplace court should be and what one of the reasons for that is you kind of in the end have to ask More efficient better for whom and in this case if you look at it There's supposedly 61 billion dollars in a funding for available for funding I mean the problem if you're if you're a claimant is it looks like in a lot of these cases you either get a home run or a strikeout No, I think the framers understood that juries can sort those sorts of things out and if you get a strikeout it may well be Because the jury determined that you didn't have specific causation that whatever your condition is it was caused by something else Well, that's probably do that much more quickly and much more efficiently than having a full-blown trial What your honor I think that's right But a Seventh Amendment tells us that if you want your jury trial you're entitled that jury trial and the framers understood that the Community the people of the United States who sit in that in the dark and make the decisions We trust them to sort those things out and the fact that some people win and some people lose We trust that the juries are able to sort that out and the notion that somehow Bankruptcy may be more efficient. That's just not a good basis for having a bankruptcy case because in the end even if it's more efficient Who is for is it more efficient and who is it benefiting here? If there's anything under 61 billion dollars That's ultimately distributed in this bankruptcy and believe me when a plan is proposed by J&J when that happens if it happens It's going to be well short of 61 billion Anything short of that all those efficiencies all that actor that accrues to equity. This is not more efficient for claimants It's more efficient and better perhaps only for equity if I may reserve any remaining time for my rebuttal. I thank you very much We'll give you plenty of time. Okay, if there are further questions, and I'm happy to entertain them I've got quite a few but we'll come back. Okay I'll brace myself here Good. Well, mr. Frederick or I guess mr. John up. Thank you very much. And then we'll get you back Thank you, your honor and may it please the court Sean gender for the United States trustee I think it's helpful to start by just taking a step back to understand what's really happening here at bottom J&J has carved off one set of disfavored crazier's claims Hand-picked a selection of assets and sent only those claims and only those assets into bankruptcy If that carefully constructed bankruptcy is permitted to proceed those claimants will be held hostage against each other With no claimant receiving any money until enough claimants agree to take whatever drips LTL chooses to release from the spigot of the funding agreement. I'm going to ask you a variation of the question. I asked of mr. Lamkin Let's assume instead of 1979 that LTL was formed 2010 when the first cases really started coming Or maybe 2014 when they saw that the cases were for real and so you You had good assets bad assets LTL gets the liabilities in connection with the the talc So let's stop in 2014. Let's say eight years Would you still be objecting if LTL now filed for bankruptcy in 2022 2021? So I think there's two different pieces here your honors The one piece is the sort of value reorganizational purpose piece whether there's the sort of financial distress That makes bankruptcy a legitimate choice And then the other piece is the sort of subverting the structures and purposes of the code and on the second piece You know, I think it's hard to say exactly where the line is in this case the fact that This scheme was implemented two days before the bankruptcy filing Again Optics aren't good here, but I'm trying to you're writing you're writing an opinion here. Where's the line? And I think as mr. Lincoln said the line is whether These machinations of the scheme was undertaken to try to subvert the principles of the bankruptcy code And so it might be the case that it happened in 2014 With bankruptcy on the mind that might be enough It might be the case that happened in 2014 with sort of valid business purposes on the mind It wouldn't be enough It's hard to give a very clear line but this case I think Very very obviously falls on one side of the line I don't think the court needs to say too much more than that to find That this sort of integrated transaction very much undermines sort of a number of fundamental purposes and structures of the code the what we left off with mr. Lampkin was the Reasons to have a 524 channeling trust Versus the mass tort system. Do you have any thoughts on that? And I think the most important thing is with all respect to the court That's not really the courts job to make the determination about which system is more equitable or which system is fairer or better That's Congress's job and Congress has created The 524 G process that sort of assumes a pre-existing valid bankruptcy And once you are in bankruptcy Congress has determined that in certain clearly defined circumstances of 524 G trust Might be the best resolution in those circumstances Congress has also implemented You know the in the Engale procedures and other procedures to try to Make the resolution of mass claims more efficient to balance the competing interests in that circumstance but the overarching thing is that Congress has determined that the strong lies in the bankruptcy code Is necessary or is appropriate in certain circumstances And really the job of the court is to figure out whether those circumstances are met not to figure out whether at the end of the day One system or the other system is better More fair or more efficient kicking the fear of a lot of litigation tens of thousands of cases and huge jury verdicts connect Satisfy this financial distress concern. So it depends on the particular circumstances I point the court to SGL carbon, which has a very long discussion of this and SGL carbon the test of this court Implemented was serving the immediate financial difficulty test. And so it could be the case that Litigation fees or judgments they've been entered Are such that there is immediate financial difficulty but but this court in a few carbons are specifically rejected the idea that the prospect even of Financial and operational ruin from a judgment at some point in the future It is enough to satisfy that test and in this case As we explain our briefs and the LTL had access to the 61 billion dollar funding agreement before bankruptcy I don't think anyone's gonna stand up here and tell you that there was any immediate concern that the 61 billion dollars would be exhausted There wouldn't be enough to satisfy judgments in the short term or to pay the litigation costs in the short term And so just under the SGL carbon test Then if this court implemented LTL was not financial distress, but when you consider financial distress, I Asked mr. Lampkin. Do you consider? Oh Consumer and LTL or just LTL and he answered LTL initially. What do you say? So I think this court Has made clear and Congress has made clear that really bankruptcy is intended to benefit the debtor And the debtor here is LTL and to the extent that LTL You know wants to take advantage of Carving off this set of claims. I think it has to mr. Lampkin suggested it's gonna live by the sword after that by the sword in that way and LTL I think narrowly focused answer said no one would tell you I don't think the LTL was in any Sort of immediate financial difficulty that being said if you zoom out The question might be wouldn't the argument be that LTL is in financial difficulty It's just that here it happens to have a very very big backstop to backstops. In fact, both consumer and Jake Johnson Johnson I don't think so Your honor I mean the rights under a funding agreement give it access so long as it's not bankruptcy I mean the money sort of disappears as soon as it files for bankruptcy But give it access when it's not in bankruptcy to 61 billion dollars and to the extent that as the bankruptcy court suggested that LTL Exercising its rights under that agreement would have negative effects on J&J or on old or new new JJCI And I think that just goes to the concern that this bankruptcy Is primarily intended to benefit non debtors who have not submitted themselves to the supervision of the bankruptcy court who haven't complied with the obligations of the code And that is for McLaren Banko is just not a valid bankruptcy purpose. There were some very One could argue and one-sided far-out Projections by the bankruptcy judge here as to what the Potential liability can be or the range of liability of I think at one point up to a hundred and ninety billion Which is significantly more than the sixty sixty one billion dollar backstop is provided by Johnson and Johnson and old consumer in that case with LTL if that's true Would LTL be in financial distress? No, your honor, and I think so the brief Obviously make clear that there are a lot of assumptions baked into that number that aren't not necessarily the value supported But but even assuming it's true An SGL carbon makes clear that the test is not all of your potential liability or all of your potential costs sort of stretching out into the future It's whether there's immediate financial difficulty As in no one is contending I don't think anyone's gonna get up here and tell you that there was that sort of immediate financial difficulty so the key word used in SGL carbon was premature and you your point here is at this point in time Today, it would be premature for LTL to say it's a financial distress Correct. And I think it's your carbon makes clear that it's not just Because it's premature but because in some ways it's speculative, right? You don't know how suits are going to turn out You don't know what costs are going to be in the future. Um, if you have an operating business It is another way of saying premature I can speculate but it's not we don't know Correct, but I think thinking about it speculation Helps explain why the bankruptcy courts findings on this are really problematic because they are speculation. They're based on assumptions Assumptions that are not necessarily supported and that you know may or may not turn out to be true But certainly there's nothing that justified in the short term the invocation of the strong protections of the bankruptcy let's assume we we Reverse the bankruptcy court. What would litigation look like going forward and is J&J having direct liability? So my understanding your honor and we're obviously not involved For the most part in the tort cases. My understanding is that at least some of these judgments have been entered against J&J directly I Whether sort of that's appropriate whether there will be more I have no idea. You know, I think if this court Concludes that the bankruptcy position should have been dismissed at that point J&J or JJCI Sort of or LTL merged back into new What would happen? They can make a decision whether they want to continue In the tort system or whether they thought that they were facing the story of financial difficulty JJCI To justify invoking the protections of the bankruptcy code at that point. They would submit themselves all of their assets to the supervision of the bankruptcy court And would comply with the codes obligations. And again, that's just for fundamentally really the problem here is Congress has given very strong protections to Andy's facing financial difficulty And has determined that sort of the shield of those protections is necessary is appropriate In circumstances where the person or the Andy taking advantage of them Submits itself to the code submits itself to the bankruptcy court complies with the many obligations of the code but here I think LTL or J&J is trying to turn what should be that shield of bankruptcy Into a sort by not complying with any of the obligations and by trying to get sort of full resolution indefinitely into the future Without undergoing any of those obligations the Congress has determined are required is the biggest concern that the US trustee's office have has that the optics of this just don't seem normal for the type of bankruptcy that is allowed by the code in America Something this is about the optics of this your honor It's about just fundamental subversion of the code and the US trustee cares very deeply about the structure and the integrity of the code And here I mean as we explain the reasons having to go through the sort of transaction the scheme here just Undermines, so let me let me try it another way LTL has existed for a number of years LTL has massive liabilities in connection with And potential liabilities in the future suits being filed every day with regard to its top products When can LTL Be safely assured that there won't be an objection of the trustee if LTL files for for bankruptcy protection And with apologies I don't think I can give you an answer that you're gonna find satisfactory on that I have no idea what in sort of other circumstances the trustee whether would not decide to object to I mean the key here and we don't think LTL is in financial distress. We don't think there's a valid organizational purpose We've made that clear but I think the biggest problem from the trustees perspective is the subversion of the code is the sort of playing games with These really fundamental important rules of the code and to the extent that particular bankruptcy wasn't doing that I think the trustees Just to sum up the most important rules of the code in your view are and I think we would focus on three things and one is The priority rules that creditors and equity holders have to be treated in a particular way Equity doesn't get anything until creditors are paid and here equity isn't getting stuff all along while creditors languish in bankruptcy Two is the idea that in adds court the code sets up a fundamental Quid pro quo where you an entity submits itself to a lot of obligations of the code And the supervision of the bankruptcy court in exchange for the codes protections and here that's just not Happening like you're talking about old concealed. You're not talking about LTL so you're I mean, I think There's sort of two things here and one is to the extent that the court wants to focus sort of just on LTL I'm just following along with your answer. I Mean, I think the point is that LTL has filed for bankruptcy. I don't think anyone would disagree to benefit JJCI to benefit J&J and those sorts of benefits to non debtors Are just not contemplated by the code The code is for debtors who submit itself to its obligations and the point of this bankruptcy isn't to benefit LTL It's to benefit the non debtors who haven't submitted the codes obligations Who haven't done the sort of financial disclosures who haven't had The supervision of the bankruptcy court who won't have the supervision of the bankruptcy court And that's just not an appropriate purpose for the very strong medicine The bankruptcy court provides truly distressed entities, which again LTL was not at the time of the file And any other bankruptcy principles that you think are violated you mentioned, too And then I mean the third one I think sort of in with the second one is the idea of it In addition to complying with the obligations of the code if the debtor submits itself to the supervision of the bankruptcy court and Sort of ensures that it's acting in a way to maximize credit or returns and here again J&J, JJCI I just haven't submitted to that supervision So that to the extent that it's separate from the second Regarding the various other obligations of the code that J&J and JJCI are not If tort litigants preferred to have their their day in court, and then it seemed wrong that Old JJIC can decide otherwise by taking advantage of the bankruptcy system I Think that depends on the particular circumstances your honor. I mean obviously I think that was a softball So Congress has constructed bankruptcy code And old JJCI might well be able to file for bankruptcy and might well be able to take advantage of Congress's protections even in the face of objections from tort claimants I think in this case obviously tort claimants are being uniquely disadvantaged relative to equity holders and relative to J&J's other creditors And that's something that's just not contemplated by the code Or by I mean anything else the Congress has established Procedures for resolving mass tort litigation even mass tort litigation that involves substantial liability And has determined that those procedures best Balance the relevant interests in the context of mass tort Thank you very much. Thank you. We're here for mr. Frederick, and then we'll take a break after that Welcome Thank you your honors and may it please the court David Frederick for the Arnall and Itkin appellant I'd like to reserve three minutes of time for rebuttal. I'd like to emphasize two points in my presentation The first is that your cases third circuit cases should compel reversal Betco SGL carbon and integrated telecom all set out the appropriate tests for determining What is good faith in a bankruptcy in this situation? LTL fails the relevant tests for financial distress and Good faith in promoting a bankruptcy and I'd like to go into that in a minute But my second point is that there is no limiting principle to LTLs position They cannot tell you when any other Corporation would be constrained from doing exactly what they have done Not just for a mass tort, but for any significant liability Johnson & Johnson is a company with a market capitalization of a half a trillion dollars that throws off Dividend income for its shareholders at the rate of 10 to 11 billion dollars a year It boasts that for 59 straight years It has increased its dividend And so if Johnson & Johnson Can get away with filing a bankruptcy to hive off its tort liabilities for TAL claimants What's to stop any other company in America from doing the same thing? I think it sounds to me like what you're saying is if the backstop Instead of 61 billion for these types of claims were picking over 5 billion then It wouldn't LTL Be in financial distress enough that it should be able to take advantage of the the bankruptcy system Well, I think that you go through the normal test judge Ambrose and one of the reasons why I think my colleagues have Resisted this hypothetical which I think you're you're searching for Where is the line to draw and I think that the answer to that is that you're going to have to assess Was there a good faith purpose and emphasize is the LTL in your hypothesized construct an ongoing concern because one of the purposes of a chapter 11 is to take a business that has an ongoing economic value and Preserve and help through the bankruptcy rules that entity emerge out of bankruptcy But you don't have that look like liquidated liquidating 11s are allowed Integrated telecom tells us that that is true But that is also why in this court's decisions in Bepco and SGL carbon it looks specifically at whether or not the entity claiming bankruptcy in order to Use that process to evade certain litigation Responsibilities had a parent and that the parent Could either provide financing or both bail it out of whatever financial Difficulty it was in and so you have exactly that situation here where J&J Was paying the TALC liabilities and it paid the Ingham judgment That's undisputed So it was on J&J to pay that it chose to create an accounting fiction by shifting the Liabilities on paper to JJC I but Johnson and Johnson did it Johnson and Johnson paid and there's no reason judge Ambrose under your Hypothesized situation one wouldn't look at the circumstances for that bankrupt entity to determine Yes, it's got a commitment for five billion But is there some other mechanism by which it could get financing in order to pay other? Claimants now if I could go to some usual one would be If in some way it had something going on like the royalties coming in possibly dip financing. I don't know but I mean it would If you are a claimant, it would seem that this is This bankruptcy is about as good as you can get absent getting punitives to have your claims Determined estimated and paid wrong. I'm sorry, Judge Ambrose. That's fine. That is that is not correct 6,800 TALC claimants have already settled There has not been a single settlement since they filed for bankruptcy What the bankruptcy does is it bleeds the oxygen out of the room for settlement? By making every last claimant wait until there is not just a final plan confirmed But all appeals have been exhausted. So there might be a that sounds like what you're The problem there is the state that was given by the court under 362 No The problem is the funding agreement the funding agreement by its plain term During the course of the appeal you have you have a bill in stay without having asked for it That's exactly right. But the funding agreement also says no money flows Until the last appeal has been exhausted and so when you deal with any kind of complicated bankruptcy in which there might be multiple plans That the last bill has been exhausted put that individual claim or put the case of all the cases a whole no money flows and that's the problem that the funding agreement is not the Be all end all to this for the claimants and Judge Fuentes you asked exactly the right question, which is who's better off in in such a system and There's no reason to think that we're J&J which knew of calc liabilities for asbestos in 1969 and Was found to have engaged in reprehensible conduct Would not also be liable for judgments for these victims for the asbestos in a product that seemingly is Is is is innocent they paid more than 92 billion dollars over the last six years to their shareholders in dividends and through stock Buybacks, so there's no question that outside the bankruptcy system in which J&J is being Benefited as a non-debtor that they would be obligated to make payments for their own culpability for these people's Problems go back to judge Ambrose hypothetical So if you were on this panel, would you venture to write an opinion identify on the line or would you say? On these facts Clearly not a legitimate for a good faith bankruptcy Judge Restrepo, I think fairly I would urge the court to say the precedents of your court compel Reversal and explain why? in doing so Some of those features of what constitutes a reasonable way to draw a line will emerge But I don't think it's appropriate in a case Essentially a first impression where you're looking at the Texas two-step as the first appellate court to do that You're looking at an entity that is not what Johns Mansville did and what was the precursor to 524 G? But it is a closed and capped System in which Johnson and Johnson has an incentive to fix the value of the funding agreement by spinning it off That agreement which is permitted under the finding funding agreement itself. So you have an entity that is not like any other Entity out there. And so to say Preemptively, these would be the circumstances of which that would be permitted Respectfully feels advisory to me. It doesn't feel necessary And given the creativity that led to the Texas two-step Phenomenon in which not a single one of these entities has ever emerged with a confirmed plan and in the meantime We've had victims of all of these various Torts go without a remedy. I don't think it would be correct or appropriate for the court to Create a roadmap for corporations to continue to do that. That should be subject to the warp and woof of litigation. I Questions You asked whether it was appropriate to look beyond LTL At JCCI I think that the way that you Appropriately do it under your cases is to look just at the debtor and you look at the debtors Financial distress at the time of filing it is an eminent financial distress test for the debtor and the reason why you do that is because the code instructs that the debtor is going to be subject to the strictures of the code and the Opportunities that the code presents and so looking beyond that It is is not the way you start now Your cases have also looked beyond the actual debtor to determine whether or not such things as financial distress is appropriate And so I can't say you shouldn't do that I think it is appropriate in this case to look at what assets are available by Johnson & Johnson to provide Additional liquidity and additional remedies for the debtor, but that's not typically where you start the problem here Though is that as Mr. Lankin pointed out your create what LTL is seeking to do is to create a disfavored set of creditors It is only the talc victims that are subject to this bankruptcy and the strictures Created by the bankruptcy at Judge Amber. You also asked which system is better now leaving aside the Academic discussions that I'm sure will ensue as soon as you have written Opinion, I would just say that I would say a couple of things for settlement and providing remedies to victims the tort system is unquestionably better why because Johnson & Johnson has every incentive to engage in negotiations that are going to in order to its benefit But will pay money So the 6,800 talc victims that have already received a settlement from Johnson & Johnson was because Johnson & Johnson Decided it was time to settle with them. Now. It might have been that the law firm that was the firm superintending those particular claimants proposed a trial threat that is a perfectly Valid reason for J&J to decide we want to settle with that law firm and get them off the board The tort system pays money also, that's what I'm saying. That's what I'm saying You can't do what I just said in bankruptcy. You can do it in the tort system and that has happened in the tort system it's no secret that the Way that the company would go do go about doing this is from a top-down We are afraid of this law firm and we do not want to go against them in court We're going to resolve those cases for that law firm or we're not afraid of this law firm But we think if we can set a low enough floor by settling out cheap Then that becomes a market price and companies do that all the time. It is a perfectly Rational way to go about resolving these that can happen in the mass tort MDL system and it does not happen in bankruptcy because of the way the Classes of the different creditors are set up and the voting rules that go along with relieving that system from The strictures of the bankruptcy rules now Just a factual question For some reason I had assumed normally that punitives are not available in Bankruptcy, but when I look at the briefs, there's not a strong statement that that's One way or the other I think it is available in a bankruptcy. Well We're not talking about negotiating I think that the question of does a bankruptcy confirmed plan Take into account punitive damages. I don't think the law is clear on that point. There is I agree. And so the question then is what can you negotiate and what is confirmable as a plan? here the anomaly is that Johnson and Johnson was hit with a higher level of punitive damages than old JJCI Why? Because it was the parent company that was misleading the scientists It was the parent company that was dealing with the FDA and other foreign regulators with respect to asbestos And so the parent company was viewed by juries as more culpable for the reprehensible conduct than the consumer Entity and so when you look at the multiple upheld by the Missouri Court of Appeals in the Ingham case That's why Johnson and Johnson was hit with higher punitives. Now how you would do the valuation of that and the confirmation of a plan. I hope that we never get to that because I would Fervently urge you to rule that this was a not a good faith of bankruptcy But I would suggest that that will be a much litigated question that will further delay the finalization of any bankruptcy plan. You asked Judge Ancro about what if LTL had been created years earlier. I think part of the test of what you look at is whether it was still part of the parent company and the parent company was continuing to finance, in which case I don't think you would find financial distress. But again, the test would be under SGL carbon and integrated telecom whether there was immediate or immediate Financial distress at the particular time years later that it was seeking to declare bankruptcy. But the second thing I'd like to say is that under that construct. One of the reasons why the Texas to step is so problematic and bankruptcy is that it does not provide for asset maximization for creditors. It is designed to starve off the claims of creditors who are claimants in the tort system. And that purpose is a very important purpose of a chapter 11 because the idea of allowing the reorganization is so that you can maximize the assets available to the creditors, but the Texas divisional merger statute as conceived and implemented in these various cases that are Pending doesn't do that at all. It tries to create a fixed cap. And in fact, that was what the J and J treasurer said in July of the year that July of 21 that they were seeking to cap their tackle liability. If they cap it is 61 billion and it turns out in a lot of the briefing that I've seen from your side that the actual amounts are going to be far less than that. Does that make much difference? We don't know. And that's the problem. Judge Amber, I can't give you a definitive answer to the question of what the value or the maximum what is going to be maximized or not. What I can tell you is that the incentives for J and J are to drive the number as far down as they can and to wait out the tout claimants who are dying at some horrible rate every day while we're waiting for this. And that's where the incentives are being drawn in this case. The problem that you also have with this is that you're targeting one particular class. So, Judge Amber, if you're if you're going to talk about any of the features that might go into what would be an acceptable plan. For this, you have to take into account the fact that any kind of divisional merger that is seeking to skive off particular liabilities. Is going to treat all the creditors the same way. So that if an entity like LTL goes into bankruptcy at some point in time, it has to meet the financial distress test. It has to meet the maximizing creditor value test. It has to have a valid purpose and not be for litigation, but it also can't target one class over another. So that the current creditors of LTL or J and J, for that matter, get benefits that only the tout claimants uniquely suffer from. So, in the course of a plan, I mean, you would have a classification under 1122 or whatever it is that specifically puts these people into their own class. Would you not? Well, if you did that, you were talking about an inordinately large class, which creates its own confirmation challenges and problems. And you're also dealing respectfully with people of different ages, different conditions, different states of ovarian cancer or situations with respect to me. So you've got it's a much more complicated situation and that's why in the tort system, the way these are traditionally done is that a group of cases will be settled and then a special master will be designated by the court to go through the circumstances of each individual claim and determine based on that pop that has been achieved what each person is going to get. That is a much more challenging feature that would, I think, in the bankruptcy system. Thank you. And we'll get you back in a rebuttal. We'll take a 10 minute break or a 15 minute break. Gentlemen. You guys want a 10 minute break? Boss spoke. Chicago, whenever you're ready. Thank you. Judge Ambrose may please the court. I very much appreciate the argument of my 3 friends and I'd like to start by discussing 3 interlocking problems with what you just heard. Now, my friend said a lot. And if it's okay with the court, I'd like to take about 4 minutes, not to to try and describe these 3 points because they reinforce each other. First is the narrow scope of your review. At this point, you're being asked to discuss decide 2 questions. First, was the petition filed by LTL made in good faith and second should protected party litigation be stayed. Now, my friend's arguments about harm to the claimants is premature. Those are planned confirmation questions or at least ones for the 524 G 75% vote. After all, as Judge Ambrose reminded my friends Congress handcrafted a specific solution to asbestos bankruptcy cases, which, among other things, requires a super majority to approve a plan. What my friends are doing is taking all of their complaints about the bankruptcy process and pushing that all into the good faith question. Those are questions for plan confirmation, not ones for today. What is before you today is the bankruptcy court's conclusion that LTL acted in good faith. That court spent 5 trial days hearing from witnesses and crafted 2 detailed opinions, all of which rejects what you just heard. The standard to overturn Judge Kaplan is daunting. As the Supreme Court in Lakeridge put it, quote, factual findings are reviewable only for clear error with a serious thumb on the scale for the bankruptcy court. Or, as this court just said in iFiber, in a complex case where the bankruptcy court does substantial work in seeking to understand the facts, great care must be exercised to defer to those findings. As for the other questions about protected parties and the stay, the bankruptcy court identified five separate bases for an injunction and even the US trustee doesn't dispute them. That's the first point. The second, the transfer of liability. Much of my friends argument hinges on the notion that J&J, not LTL, last year evaded claims by restructuring. But the key fact is this, J&J didn't owe anything, didn't owe anything for these claims last year. J&J didn't owe anything the year before. J&J didn't owe anything for the preceding 43 years. That is because in 1979, J&J transferred its entire baby business and all of that liability to JJCI, a separate entity, and JJCI agreed to fully indemnify J&J for all claims. So what actually happened last year? JJCI restructured and created two entities, new JJCI and LTL. Every dollar that the old JJCI was liable for, every dollar of its own conduct in anything alleged by J&J, the new JJCI had agreed to pay 100%. The restructuring and bankruptcy petition didn't evade anything. It was a full one-to-one placement. Indeed, it was even more than one-to-one for reasons our brief explains. Now, my friends say, well, they represent the victims and speak for them. That proves our point and proves Congress's point. They are all current claimants. Our argument is that each of their court lawsuits has tunnel vision. It examines only their individual case and delays future ones. It's a home run or a strikeout, and precious few get up to bat. The only way to get a system-wide resolution that's comprehensive that protects future claimants is through bankruptcy. Third and finally, they ignore several key limiting principles of our argument, particularly Mr. Frederick, and four things make this case unique. First, a latency period of nearly 50 years with many, many future claimants who can't get any relief now and who risk not getting paid. Second, wild lottery-style judgments like Ingham, including some for billions and a massive number of cases, 40,000, with more files every hour of every day of every year, creating a tsunami of litigation. Third, Congress has expressed handcrafted rules for asbestos bankruptcy cases under 524G, including a 75% supermajority requirement and a rule that two courts, not one, a bankruptcy court plus a federal district court, must approve the plan and scrutinize it for fairness and equity. And D, finally, or fourth, finally, all in the context of a 1979 full transfer of liability from J&J to old JJCI, as well as old JJCI providing full indemnity back to J&J. So this isn't a case of a parent dumping its liability the day before restructuring or anything like that. J&J has not been liable for decades. In short, nothing in the restructuring hurts the claimants, and even if you disagreed, the proper time to evaluate that is far down the road. And here you must just simply decide whether the petition is filed in good faith. The blink response when you hear about the divisional merger statute and how it's used, and people use the name pejoratively Texas Two-Step, is why didn't you just file old consumer? Life would be so much easier. You might still have a battle as to whether there was financial distress, but it would at least be arguably a cleaner battle. So, Your Honor, several responses, but the most important one is the one that the bankruptcy court gave after listening to the testimony. And you never really actually heard a response to it from my other side. What Judge Kaplan found is if you force that entity, old JJCI, to go bankrupt, it would have, quote, a horrific impact because old JJCI makes all sorts of JJCI makes all sorts of things like, you know, Band-Aids, Tylenol, things like that. It sounds to me like only that's an attempt to preserve goodwill, which, of course, has been earned over the years. But it sounds like the argument that's being made from your side is that it's a whole lot of inconvenience, a whole lot of inefficiency, a whole lot of harm to goodwill. And why not allow this more creative way to separate out the bad from the good? Your Honor, that is a part of the argument. It is not by any stretch the whole argument. So, just to take a step back, I think what the bankruptcy code would ask is, the relevant question is, is the bankruptcy petition maximizing the value of the debtor's estate? That's the goal, the purpose that we are isolating from page 120 of integrated telecom. So, I don't think the bankruptcy code says you're to burden debtors for the own sake. You're supposed to do it because, in some sense, it's going to maximize the value. And so, one thing, and this is my first answer to you, what Judge Kaplan found is that you are maximizing the value by going through the divisional merger statute. Because, otherwise, there would be actually less money available, including to claimants. Because of the loss of goodwill, the loss of all that, you know, forcing the entire company into bankruptcy, all the different findings he found. Now, another key part of this is, there's two possible reasons, I think my friends isolate, for why you'd want this larger entity, to force this larger entity to go bankrupt. One is, because you want to guarantee the amount of money that this larger entity, JJCI, has for claimants. And that's exactly what the funding agreement does. So, does old JJCI qualify for financial distress? We believe it does, as does LTL, as my friends do as trustees. If it does, then isn't it the real party in interest? Well, I don't know if it's a real party at this point, because LTL is the one that filed the petition. We agree with Judge Kaplan. Either way you slice it, whether it's LTL or JJCI, there's massive financial distress. And I can go through that evidence. But I do want to first really deal with your first question, because I think it's the heart of life. They're dovetailing together.  But Mr. Lamkin really spent a lot of time on this idea that old JJCI was the entity that had to go bankrupt. And our first point to you is, the one main reason why he's isolating is because you want claimants to get paid. But this funding agreement gives the entire value of JJCI, the entire value, $61 billion, free and clear to the potential claimant. So that entire pot of money is available. Now, my friend says, well, maybe JJCI will squander the assets. And that's why you need bankruptcy court jurisdiction. Maybe they'll transfer it to equity. The funding agreement, this is quite important to our argument. The funding agreement itself bars that. Or if it occurred, if there were any payment to J&J or to shareholders or anything like that, distributions, all of that increases the $61 billion pot. $61 billion is only a floor, not a ceiling. I'd like to walk you through the language of the funding agreement so that it's clear why my friend's argument is wrong. So the funding agreement says that you take the greater of either one, the fair market value of old JJCI immediately prior to the divisional merger. That amounts to $61.56 billion. That's appendix page 7422. Or it says it's the fair market value on the date that LTL and the new JJCI refused to pay under the funding agreement. That's appendix page 4316 and 4619. Here's the most important point about 4619. If a hypothetical that my friend says happens and it materializes, that JJCI does something to try and give J&J money to, you know, in the form of distributions or something like that, that just bumps up the amount of the funding guarantee under the agreement. That is page 4319. So the funding agreement solves for exactly the problem. We don't think there's anything in the code that requires, of course, you know, the larger entity to declare bankruptcy. But to the extent you're worried about it, to the extent you're worried, oh, you know, maybe this is going to create some bad incentive, the funding agreement does that. And here's the second most important point. J&J guarantees that funding agreement, not just JJCI. In the current world, in the pre-restructuring, pre-bankruptcy baseline world, they could maybe try and sue JJCI. We know those lawsuits take time and so on. We could talk about that in a moment. But the most important point is whatever their lawsuits would get, it would only get up to $61 billion and not even that, because that money is not free and clear. It'd be subject to all the other creditors that JJCI have and stuff like that. And of course, there's no J&J guarantee under the pre-restructuring world. Let me work backwards. When do funds come out of the funding agreement to pay claimants in a bankruptcy? So under the terms of the agreement, first LTL has to pay in whatever they have. And then new JJCI is to pay whatever they have. And then afterwards, anything else, if there's any excess. What about the point that Mr. Frederick makes that no money's come out until all the appeals are resolved? Well, I think that's true, of course, in the regular tort system, in the bonds under Rule 62 of Federal Civil Procedure. So I don't think that's any different from the standard system. And of course, here, I think you've got to grapple with Judge Kaplan's finding that there are 49 trials have happened, Your Honor, to date. And all of these cases- 35 have gone to verdict, right? Yeah, very, very few. So 18, you won, 17, you lost. Yeah, and then some of those were reversed on appeal. And as Judge Kaplan said, we have a very good batting rate for all the reasons that are briefly explained. But nonetheless, at the end of the day, there's going to be financial distress because of the massive number, 40,000 lawsuits and more being filed every day. Let's go back to, you said, the full amount, all assets of old JJCI are available to pay claimants. So once again, you come back to my question, why not file old JJCI in the first place? For two reasons. One is it would reduce the number of dollars actually available to claimants because forcing, as Judge Kaplan found, old JJCI into bankruptcy reduces the value of JJCI. Except you've got a company that is ongoing with very, very profitable products that have been well-earned over decades. And that's exactly Judge Kaplan's point, which is you don't have to, because of the funding agreement, because you get all of the good without the bad. You get the full value of the company, not subject to any creditors or anything like that. It's free and clear, up to $61 billion. And then you get a backstop from J&J. And remember, my friends, their brief says J&J has better credit than the United States government. So in terms of which deal is better for the claimants, for all the claimants, not just my friends sitting at the table, but including future claimants, which is a huge chunk, as Congress noted, in 524G because of the latency period for asbestos. If I understand you correctly, if I'm hearing you correctly, it almost sounds like J&J did this to benefit the claimants. They had the claimants' best interest at heart, and then they do this Texas two-step. But the timing doesn't suggest that. The timing suggests that this was really done for litigation advantage. As I understand it, LTL was created four months after the Supreme Court denied cert in the Missouri litigation. And the next day, they declared bankruptcy. So how do you reconcile that for me? Because I'm having a little trouble with that. Absolutely, Leonard. This is exactly what my friend said to Judge Kaplan, and he rejected it on the facts. Not litigation advantage, but four separate purposes. The first purpose- You concede that there is a litigation advantage by doing this? Well, I think it's a byproduct of this. There is a litigation advantage. Well, I think it's a byproduct, but as Judge Kaplan found, that wasn't the reason. LTL has been transparent. There's been lots of discovery on this that Judge Kaplan referred to and said, no, the reason for this is fourfold. First, that there's huge defense costs to the tune of $2 to $5 million per case, multiplied by as many as 40,000 cases. You didn't hear a word from my friends. They have a lot of time up here. They didn't have an answer to what Judge Kaplan found. That's a huge deadweight loss. Every one of these cases costs us millions to fight, and even if the claims are meritless. That's all money that could be going to the claimants, but now it's not going to the claimants. Instead, it's going to pay attorneys. The second is, as I was saying to Judge Ambrose, the horrific impact of what Judge Kaplan called the massive disruptions that would endure if all JJCI was forced into bankruptcy. That's at page 847. Third, the equity concerns for future claimants, which is a particular concern here, given Congress's handcrafted statute in 524G and this very long latency period. We understand my friends have to zealously represent their clients before this court. They represent current clients. What Congress is telling you is, there's a worry about latency and about future claimants, and this is a solution that's comprehensive for everyone. Lastly, Your Honor, it's because Judge Kaplan found the bankruptcy process is a lot faster than the tort process. My friend talked about 6,800 settlements, but doesn't mention what Judge Kaplan said about that, which is, he said two things. One, that will be dwarfed by the 40,000 cases that have already been filed and the many more that will come. Also, he said that the past number of settlements won't occur in the future, and this returns to your question, Your Honor, because of Ingham. What Ingham did was basically create a shiny object for folks to try and keep their cases in the tort system with the hope of a lottery-style big payday. Some people will get home runs. Most people, Judge Kaplan found, don't get a turn at the bat. That's what LTL was dealing with in this restructuring, and that's why the funding agreement is written the way it does. It provides my friends, as well as future claimants, a guarantee of at least $61 billion. Now, Judge Ambrose, I think you pointed out, well, there's some kind of contradictions here. How much are the claims really worth? And Judge Kaplan, of course, talked about that in his opinion. He said- I didn't see any strong defense of his $190 billion. Well, it's up to $190 billion, and it was just the defense costs, and he got it by simply saying $2 to $5 million per case multiplied by 40,000 cases. It was the high end of every- Correct, and we're not defending necessarily the high end, of course, but we are defending vehemently Judge Kaplan's conclusion after hearing from expert after expert, including Dr. Bell, about the level of financial distress that the company faced, and my friends are asking you to reweigh the evidence and say, oh, well, these lawsuits actually don't impose as much of a present liability or this or that. Judge Kaplan evaluated all of that and found financial distress, including, most significantly, in 2019, the consumer division had a $2.1 billion profit. And just the very next year, because, Your Honor, because of Ingram, along with other TALC litigation, they had a $1.1 billion loss in one year, and TALC liability, Judge Kaplan found, was responsible for that. If you look at the years 2018 to 2020- TALC liability was responsible for a significant portion of that, wasn't that correct? Correct, yes, a significant portion of that. And the TALC litigation, for example, Judge Kaplan found, from the years 2018 to 2020, cost 27% of all costs of all JJCI and 32% in the year 2021. Coming back to the outset, if you have a parent company and it has a subsidiary, let's change its name, but a subsidiary has been there for 43 years, and the subsidiary has a major problem with one of its products that's caused mass tort litigation and some fear of what could happen in the future. Usually what happens over all these decades is you file the subsidiary and you go from there. If the concern, and you said that all of the assets of old JJCI will be put into play for funding the claimants' claims that are valid, and you look at the next case, I think as Mr. Frederick said, and you're worried about, okay, you don't have a Johnson & Johnson consumer, you have Acme. You know, Acme, Inc. I don't mean the grocery chain, by the way. I apologize to them. I'm thinking of the old Warner Brothers cartoons. That they don't have $61 billion. They are there with maybe $4 or $5 billion at tops. They're going to run out of things, and they're saying, we're going to do this divisional merger and go from there. And you can see that this slippery slope comes into play, and people are saying, let's stop this before it really gets out of hand. Right. Totally. We are very sympathetic to exactly that argument, your honor. So refer it to three points. One is you're exactly right that the ordinary course is a subsidiary would declare bankruptcy. That's your own opinion, joined by Judge Fuentes and Ray Owens Corning back in 2005. That's exactly what happened. That's what this court approved. Second, we're not here defending something in the absence of a funding agreement. If there is no funding agreement, the valid bankruptcy purposes that Judge Kaplan isolated those for look very different. They look like litigation advantages. But here, if you were to ask, what is the litigation advantage that is served that could somehow dwarf Judge Kaplan's four different findings of valid purpose? You're hard-pressed to do so because this deal gives this restructuring and this petition gives actually more to the claimants. Now, all the claimants, including future claimants. And that's what Congress is telling you. This funding agreement has a bifurcation. It will fund in bankruptcy and out of bankruptcy. Isn't that correct? I believe it only funds in bankruptcy. What does it do outside of bankruptcy? I don't think it has any life outside of the bankruptcy. So basically, it's a... In Ingham, when Johnson & Johnson stepped up and paid, it did it for what reason? Because of a judgment was against it? So actually, it's just flatly wrong, Your Honor. Ingham was paid not by Johnson & Johnson. It was paid by JJCI. I don't know where my friend is getting that from. And indeed, I can point you to different parts of the record, which directly contradict what he's saying. Of the 17 verdicts, of the portion of the 17 verdicts not overturned on appeal, how many of those verdicts also were against J&J? I think some may have been against J&J for derivative liability or something like that. But all of them were paid for by JJCI or now LTL. Every one, every dollar. And so, you know, the 1979 agreement actually is written to say it's a full transfer of liability to JJCI. But it also says full indemnification for J&J. And everything has to be paid for by JJCI or now LTL. So any suit against J&J at any point is always going to be paid by now LTL. That's the logic behind Judge Kaplan's finding on question two about whether the stay should be extended to protected parties. One of the questions I asked the other side of more than one counsel is when you look at this picture, are you taking into account just LTL or LTL and all JJCI? And their answer uniformly was LTL. It sounds like from what you're saying that part of the equation here is taking into account old JJCI. Well, we think actually we agree with the U.S. trustee that the relevant question is actually is whether LTL as the petitioner is facing financial distress. But we can understand why Judge Kaplan also made findings on old JJCI. Specifically, he meshed them together. Yes, he found either way that there was going to be financial distress. And so we agree with, you know, we agree with the way Judge Kaplan approached it. So either way, whether you look at LTL and the litigations they faced or you looked at old JJCI and the litigations they faced, either way, it's going to meet this court's test for financial distress. What Mr. Frederick said is take a look at the three cases that this court has decided, BEPCO, SGL Carbon, and Integrated Telecom. We very much want you to look at those cases because all three, I think, are miles away from this case. In BEPCO, there were six litigations in total, six. In SGL Carbon, six complaints in the United States, one in Canada. Integrated Telecom, a whopping one securities case at issue there. And most importantly, each of those... Let's just take, for example, SGL Carbon. It looked like what was being done was ultimately to file for bankruptcy. And in the end, when you have a dissolution, it will be under state law that will return equity back to the equity holders, which one would, under the absolute priority rule in bankruptcy, not see happening. So I think, you know, I think SGL Carbon really goes on the few litigations, and this is done for litigation advantage. That's pages 124 and 125 of that decision. Of course, here, to the extent you're worried, Your Honor, about what my friend said about somehow money being paid to equity in a violation of the absolute priority rule. As I was saying, the funding agreement captures that because every dollar that goes to J&J from JJCI in the form of a distribution, at page 4319 of the record, makes very clear this funding agreement says that just bumps up the value of new JJCI, the amount available to the claimants. How would you propose, in the example I've noted, that you'd have a much less funded entity in bankruptcy and a much less funded backstop? How would you propose that bad consequences be blunted? Through the court's review process. So, and even before the review process, of course, was the 524G solution because 75% of the claimants would have to approve it. And, Your Honor, as you said to my friend on the other side, you always have the possibility of filing an adversary action for fraudulent conveyance. And indeed, they tried some of that language in the bankruptcy court. They tried to suggest this was a fraudulent conveyance. But at this court, as this case comes to the court, they dropped all of that out because I think it doesn't cut the mustard. Here, this funding agreement is... The only answer I got was it's premature to do so now. Let's figure out whether the filing was in good faith and then they'll cross that bridge when they come to it. I mean, that's the answer that I got. Yeah. And I just don't think that that ultimately answers the question. And I just want to return to, for a moment, to those three cases that my friend was referring to because, pointedly, they distinguish between those six or seven litigations and the many thousands, I think 16,000 that were at issue in John's Mansville. And they said that is the kind of, certainly the kind of flood of litigation that would create financial distress. And here, Judge Kaplan looked at the existing 40,000 litigations and said that is certainly enough for financial distress, given the numbers, the testimony from Dr. Bell that I referred to earlier, and the like. Is LTL fully capable of satisfying the TAO claims? By itself, without a resort to the funding agreement, we think the answer to that is no. But with the funding agreement, absolutely. Our position, and Judge Kaplan's position, is that $1,000, which is, of course, only a four, could go up, is enough to pay 100% of all valid claims. And when I say valid claims, it excludes two things. It excludes the deadweight losses of billions and billions of dollars paid to lawyers for defending against this. So the bankruptcy system avoids that, as Judge Kaplan explained. And second, and this gets to a question that, Your Honor, you asked Mr. Frederick, it excludes lottery-style punitive damages. You're absolutely right. We spent a long time looking, trying to understand, does the bankruptcy system bar punitive damages? I think the answer to that is no, it doesn't bar them. And we certainly think that, but we think that it would have evened it out to the extent there were any available. The way that I think the process would unfold, Judge Ambrose, is there's been an estimation expert appointed, the name of Ken Feinberg, obviously an expert in this field. He is going to look at the amount of liability, and he could, I suppose, and probably we'll get briefing on, should punitive damages be part of that estimation process. Does J&J have any direct liability in this case, given the 50-year latency period of these TAO claims, right? Does J&J have any direct liability or direct exposure? We don't think they have, they certainly don't think they have any exposure. I'll walk you through the language of the 1979 transfer. So, it first transfers, quote, all of the businesses of the baby division to this subsidiary, JJCI, and all assets and liabilities. Judge Kaplan excerpted it at A163 and A164. And then it says, JJCI, quote, agrees to assume all the indebtedness, liabilities, and obligations of every kind, and the subsidiary will forever indemnify and save harmless J&J against all the indebtedness, liabilities, and obligations. That is a very, very strong indemnification. So, J&J, and that's why, since this has been written in 1979, J&J hasn't paid a dime. It has always been all JJCI. Now, it's true, there's a centralized account, which is used in lots of parents and subsidiaries, in which J&J initially may have sometimes paid the cash out. But as the record shows, it was always booked back to all JJCI. That's appendix pages 4107 and appendix 8103. And, you know, as I say, if you look at who paid Ingham, it was not J&J, it was JJCI. Why would punitive damages be a factor to consider? Because I think Congress was worried about this in 524G. Because you have the massive number of future claimants with this long 50-year latency period, you have to worry that a $2 billion verdict in Ingham added to other punitive damage verdicts will take away from the ability of future claimants to recover. That's why we're here, Your Honor. That's the purpose based on looking at this evidence. I know it makes for a good story to say, you know, this big company that has all these profits is somehow trying to evade responsibility or something like that. And as I said, the agreement from 1979 on has always transferred all of that liability. Now, Judge Ambrose, you asked my friend on the other side, what if this were done in 2014, or what if the restructuring as opposed to now, is the use of this Texas divisional merger statute, what is the problem there? And I think the bankruptcy code takes the debtor's corporate structure as a given, as it comes under state law. And we followed here Texas law meticulously. And I think it'd be a very dangerous rule for this court if you were to line drawing, and I couldn't hear my friend's answer to the questions about line drawing, is 2014 okay? Is last year okay? Is two days different? Or something like that. And so I think that's one important point. The other is actually that 524G itself contemplates pre-petition restructuring. And I point you to 524G for a little too big IV. Sorry about that. Exactly. It is a long statute, but it provides that a channeling injunction can bar actions, quote, directed against a third party and arriving because of its involvement in a transaction changing the corporate structure of the debtor or related party. And so if Congress thought that a full company is the thing that must declare bankruptcy, I don't think it would have included this provision in it. Rather, I think Congress anticipated basically that there would be pre-petition restructuring. I think it's notable that my friends, for all they're saying, they say we're inconsistent with the bankruptcy count. What provision are we inconsistent with? What provision are we violating? There's some meta principle, I guess, that they're isolating, but they can't point to any particular provision. They're pointing out the gateway provision that you have to file a bankruptcy in good faith, and they're claiming that this was not done. So that's what we're talking about. That's the primary issue. And if that's what they're isolating, we think Judge Kaplan found four different reasons why the valid purpose of bankruptcy. One just fact question. In terms of the proposal made here to deal with the liabilities of LTL and the funding, were those types of proposals, any variation of that made in connection with the MDL litigation? I don't believe the funding agreement had anything to do with the MDL litigation. Rather, as the court found... I'm just saying the concept. Yeah, I don't know about the concept. I mean, I think the only thing I'm aware of is the court's finding in 813, relying on their own expert, that this was a single integrated transaction. And so with the restructuring and funding agreement. Now you had asked before, Your Honor, I just have to slightly correct something. I understand that the funding agreement does have provisions for funding outside of bankruptcy. Yeah, that's what I thought. Yes. So I apologize for that. What are the opt-outs that are being considered? So the 524G process has... Looks like people who can say, I don't want to be part of the bankruptcy, I'm going to opt out and go forward with respect to my litigation. Yeah, so I mean, I think Congress put that into the statute itself, saying there has to be a 75% requirement for the plan. And then of course, there's two court review. So there's a lot that has to happen. And I think the most important point about that... Do you think that 75% threshold, which is not yet in place, will allow for any type of opt-out? I don't know that we have gotten that far. I think that's a pre... To use a word from earlier, I think that's a premature question. But I would say that with a 75% threshold is, of course, very daunting. We are highly incentivized to put a good plan together, because otherwise, we get returned to the mass tort system with all of the uncertainty and all of the problems attendant to it. And Judge Kaplan, my friend, Mr. Frederick said, he wants you to write a decision really about these facts. We absolutely agree. Judge Kaplan has said time and again, his goal is to move this thing incredibly expeditiously. My friends on the other side said they thought this process could be done as early as the first quarter of next year. And Judge Kaplan has rejected time and again, any attempts to delay the bankruptcy process, which looks very different, of course, than what's going on in the tort system, as Your Honor was asking my friends on the other side. Massive delay, only a few trials to verdict. And as Judge Kaplan found, future trials are going to be even more delayed and very few settlements because of the Ingham verdict and other things. And so you were asked to compare two different worlds. One is the baseline of the pre-restructuring, pre-bankruptcy world in which Johnson & Johnson owes nothing, in which some people slowly get paid, but that's subject, of course, to any other claims against old JJCI, any recovery. There are huge defense costs. And future claimants risk not getting paid with all the latency. And under the restructuring and the funding agreement, instead, you have a very different world, one with a $61 billion plus floor. That money is guaranteed free and clear. You have a faster process, so current claimants get paid. And future claimants have a voice at the table. They have a representative because that is under 524G. And of course, the claimants, including everyone sitting at that table, we have to persuade three-quarters of them that this is a fair and equitable solution. And then we have to persuade two different courts about that, the bankruptcy court and the district court after that. And we will have, you know, Ken Feinberg's estimation as part of that to start to break what otherwise has been an intractability between the parties. Is LTL going to continue as a going concern afterwards or is this just liquidating trust in effect? Well, we suspect that, you know, LTL does have, for example, a royalty business that will continue. How much does that bring in a year? It brings in about $50 million, the record shows, a year and is worth about $350 million. So by itself, Your Honor, to answer one of your earlier questions, that isn't enough to provide, that money isn't enough to avoid financial distress. And so if LTL doesn't restructure and doesn't have the funding agreement available to it, then obviously it's going to be, you know, it's going to be underwater and have all the problems Judge Kaplan referred to. What do you make of the stay? Your friends, as you keep referring to them, are adamant that the court would exceed its jurisdiction with respect to the stay, issue number two. Yeah, we think that Judge Kaplan, as I say, he identified five reasons why there is, and crucial to all five, and they're all independent of one another, they have to run the table. But I think one central idea he had is that this involves the same basic claims during the same time period. And what he did is, it's a limited stay against certain parties. And it's a surgical one. In order for a stay to occur, two things have to happen. Surgical with 670 parties? Yes. But again, Your Honor, we're talking about a massive amount of litigation, 670 versus, as I say, 40,000 claims that are currently in existence. I'll read to you the terms. How many insurers are we talking about? Is the whole shooting match 670? I think it is. The whole shooting match is 670. The insurers, the list is at pages A249 and 250. I don't think it's very many. It's like AIG, Prudential, and the like. Let me read to you the terms. How many retailers? The retailers are, that's a three-page list at A245 to 48. There are a number of them. It includes, you know, CVS and things like that. And here's what it includes, and then let me tell you what it doesn't include. It includes two things. One, claims, two things must have to happen. The claim must first arise from the manufacture or sale of talc-containing products by old JJCI or J&J, and second, that were asserted against or could have been asserted against old JJCI. That's Joint Appendix page 195. And so it's not, for example, a stay on unrelated things like mesh litigation against J&J or anything like that. And it's done, and this is crucial, it's done for a simple reason. Because if you can start suing, Judge Ambrose, the retailers like CVS or the insurers, that reduces the overall pot of money that is available to the claimants, both present and future. And particularly in a world in which Congress has set a 75% supermajority threshold that we have to... CVS has its own insurance, right? CVS may have some of its own insurance, but certainly, you know, I think that there will be indemnification obligations that Judge Kaplan found were automatic at page 181. And so, and I don't think automatic is even the test, but even to the extent you thought it was, there were automatic indemnity obligations. And so I think what the logic behind this stay is, is that otherwise, that limited amount of money will be going to these other things, and therefore, reduce our ability to actually persuade 75% of them to confirm a plan, which is, of course, what Congress is asking for here. Congress looked at the problems with the mass tort system, the problems with the MDL, which by the way here include no state claims, include no mezzo claims, wouldn't include Ingham, for example. So, and Congress decided that MDLs wasn't the way to deal with this specific problem. And so to return to an earlier question you had, Your Honor, about the precedent that's set, those four limiting principles that I said at the outset, we think are crucial here. We're not saying that you can, you know, that you can do this in other areas where you don't have a latency problem, but here you do. You have a huge number of future claimants, and Congress has isolated specifically that. That could be taken into account. We're one to get a settlement in an MDL. I'm sorry, could you? That could be taken into account. We're one to get a global settlement in an MDL. But an MDL will never give you the stay that, an MDL will never give you the stay on litigation that is necessary to craft a kind of comprehensive plan. All an MDL does is coordinate pre-trial proceedings. But they often do result in settlements. They may result in settlements, but in order to, Your Honor, I think to go that way, you're going to have to jump over Judge Kaplan's findings about settlements, in which he found that because of Ingham, and because of a variety of other things, the past settlement rate is no guarantee, and indeed is not going to happen in the future, that fewer parties are willing to settle because of Ingham and because of other things like the FDA test and things he isolated at Joint Appendix page 841. If settlement is a viable option in the context of a bankruptcy via a plan, of course, why would it not also be a viable option in an MDL? Because you don't have, for one thing, you don't have future claimants at the table. So Congress has specifically put in It could, but they don't have any voice in the process. And so the incentive is, is, you know, again, and I don't fault my friends, but their job is to zealously advocate for current claimants, their clients. There is no, that's why I think Congress wrote the statute in 524 that it did. And, you know, could you imagine some hypothetical world in which the MDLs do actually do all this? I suppose you could. It's just, there's literally no evidence that that's ever happened. And the amici briefs that are before you, including, I'd suggest the National Association of Manufacturers brief at pages 15 to 16, really goes into detail about the inability of MDLs to actually provide any relief or any settlements actually that, that generate payments to the claimants. And so again, to return your honor to the question you asked my friend on the other side, which is what's the more efficient solution? What's the way we've gone through this process for year after year, and it's not working. Congress has given you a different approach, a different way to go in 524G. And what we've done is through the use of this funding agreement, provide a backstop that's much better than they could get under the Mass Tort System, not for any one of their individual clients, but comprehensively and overall. If I could, you had asked about the state before as well, and also point you to, I think the language of 362A3, and this court's decision in McCartney, which I think as Judge Kaplan found, was, it was square precedent in saying... How many of the 670 are J&J entities besides J&J itself and J&J consumer? I suspect that most of them are not, and you know, are not J&J entities. And our point is not to benefit... Roughly how many are? Your Honor, I haven't looked at those appendix pages. I think it's appendix pages 245 to 50, list all of the protected parties. So I'd point you to those. I just don't want to characterize them. It's in the hundreds, is it not? I think there's many, many other entities. And our point is, this state is not being done to benefit them. It's not being done to benefit J&J. Have they been sued in these various 49 actions that have gone to trial so far in the United States? Or almost went to trial, I should say. I'm not sure if they were sued in them. I'm sorry, Your Honor. I don't believe so, but I'm not positive. I think there are litigations against them. And the purpose that we're seeking for the stay is not to benefit them or not to benefit J&J. It's rather to hit pause and make sure that the corpus of funds is not available. And we feel so about this, that if we weren't able to get the 362 or 105 stay, this first question about financial distress and valid bankruptcy purpose doesn't help us. The petition is basically meaningless for the reasons Judge Kaplan found. We need that stay, because otherwise, they, plaintiffs, will sue for these very same claims. They'll sue some other entity, and that will hurt us in forms of the indemnification. But if it's not Johnson & Johnson or Johnson & Johnson Consumer, which have been involved in connection with this process, how could they possibly win against Johnson & Johnson floor covering or whatever? They'll be indemnified. So whoever the entity is that sued, they'll be indemnified. They'll share insurance policies. But the point being that the suit's not going to win against them. Johnson & Johnson was the one involved until 1979 with the towel products. Then it was baby products, which later became Consumer, and now it's LTL. These other entities in the hundreds, what I don't understand is why this stay is so broad. Because those are, as Judge Kaplan looked at the claims, the same claims. It's just a different place in the supply chain. And it's pretty common in these mass tort cases to sue everyone in the insurer, the retailer, and the manufacturer. And to be sure, we think at least with respect to suits against J&J, they wouldn't have viability. But as Judge Kaplan also found, even a very low success rate is enough to create financial distress. That's because of indemnification agreements, correct? Indemnification, insurance. It would bleed the fund. Exactly. It would bleed the fund. Exactly. And again, with a 75% threshold that we have to meet in order to confirm a plan, if the fund is bled and insurance proceeds are dropped or things like that, it's very hard. And then there's also, of course, the possibility of record change, as Judge Kaplan also found. So those are all different reasons why the stay looks the way it does. And I understand it's a large number of parties, but it's a large number of parties for a very important reason. There's a large amount of litigation in this space, and 670 is an appropriate amount. Now, if you disagree and you're worried about it, as Judge Kaplan also said, I think he said 8173, he will have the parties come back and have to continually justify the breadth of the stay. And of course, anyone can come in and try and lift the stay or something like that. We're and quickly to try and develop a plan that 75% of them can agree because otherwise, as Judge Kaplan has said, he's going to dismiss the bankruptcy petition. He said it's really important that this all move incredibly fast. And we are as incentivized as it comes to make sure of that, because otherwise we're stuck in the old pre restructuring world. And the U.S. trustee is with respect to that, that's a matter for Congress in terms of picking one system versus the other. Well, we do think Congress has exactly picked that in 524G. And so, to be sure, if we violated some state law, violated the Texas Divisional Merger Statute in some way, shape or form, that's a problem. And Congress would have to fix that by allowing something. But here we complied with everything in that statute and the bankruptcy code takes state law as it finds it. And we understand that there's a way to abuse the Divisional Merger Statute. We don't doubt that. It's just that in this case, we think you should write a limited opinion, just as the bankruptcy court did, that says, with this funding agreement, this is a valid purpose and this is an appropriate amount of parties to be stayed. In connection with the stay, which Judge Restrepo brought up, an opening question I have is that the jurisdiction of the court, is it a court proceeding? In other words, saying that it's a court by virtue of 362A1 dealing with the debtor or 362A3 dealing with the debtor's property, or is it related to? I have a dumb question. If it's just related to and therefore non-core, doesn't a bankruptcy judge have to go to the district court with a report and recommendation and have the district court sign off? I'm always scared, Your Honor, when you ask a dumb bankruptcy question. I'm starting to get worried. I said to a couple of people, this is a dumb question. No, I think you have it exactly right. That is something that the district court would have to approve if it's related to jurisdiction. Of course, here it's 362 that we're placing predominant emphasis on and also the other parts of 105 under a rising in or rising under. If I could walk you through that. For 362A1, there are two different theories the bankruptcy court found. One is that these are lawsuits that are virtually against the debtor. He said it fits under the very first clause of a proceeding against the debtor. Then he also said it's quote a claim against the debtor under the second part of 362A1. We think the second part is the right way to think about this, that these lawsuits are in effect for reasons that Your Honor mentioned effectively against the debtor and it's a claim against them. As the second circuit said in colonial realty, that second part of A1 has to have some meaning. Can't just literally be suits against the debtor. It includes third parties, at least here where the third party lawsuits involve the same basic claims during the same time period. Then there are questions about 105 and a rising in and a rising under. We think there that the automatic stay- It's hard for me to say 105 is a rising in or a rising under. Rising under means it's explicitly given to you in the code. Rising under means it comes to you as a result of something else that's in the code. 105 is sort of one of those things that implements something that otherwise may be given to you. I think here the theory is, and many courts have done it including the court below, is to say that 362 is the thing given to you in the code, the automatic stay. As for the debtor. Exactly. Then in order to safeguard the vitality of that and to make that process work, you need to stay against others. Not that the court will adjudicate on the merits, of course, of those other cases. It's just a temporary pause under 362 and 105 to make that process work. My perception based on a lot of anecdotes over the course of years is that most courts just say, okay, we're going to be practical about this. We're going to put this in play and go from there. Basically, it's a pause. We need this pause in order for people to negotiate on and on and on. They glide over some of the jurisdictional issues. Yes, I certainly think that's happened, but I do think the court in McCartney really did, I think, go into some of those jurisdictional issues. Of course, A.H. Robbins in the Fourth Circuit really in detail tried to flesh out these different points. Your Honor, absolutely. To the extent this court is worried about the breadth of this stay, if you don't think it's surgical, we obviously do. The remedy for that is that very practical one, which Judge Kaplan has already said he will do, which is to make sure and police this stay for the protected parties to make sure it is the same claims and that it is justified. We're not here to try and just stop litigation for its own sake. We're doing it in order to protect the integrity of the process. As I say, it's so important to us that entire first question is just not helpful to us unless we have this stay in place. Since you don't get rebuttal as the affilee, I'm going to give you a chance to do some summing up. Great. If I could, I want to respond to one other thing my friend said on the other side, which is that JJCI could be spun off, he said, under this and that that would be problematic. But the funding agreement itself says that if there is a spinoff, Paragraph 4B of this, this is appendix page 4239, says that itself will be considered part of the fair market value. So again, this is an agreement that increases in value over time as JJCI increases in value. The claimants get the upside of all of it. And to the extent there are concerns, whether it's distributions or spinoffs, the agreement itself polices those things. And we're asking you here, Your Honor, for a limited ruling to affirm Judge Kaplan based on his factual findings. We know this is a painful case. We know this is hard, for everyone involved. But Judge Kaplan in the very last page of his second opinion, he said, you know, delay is something that he thinks about all the time as the claimants die. And the best way, the most efficient way to actually provide claimants with relief, both present and future, in an even-handed, equitable way that avoids the deadweight losses of millions and billions of dollars being given to lawyers, is through this solution. And if you're worried about whether it's fair or not, they have remedies, the 75% vote, the two-court review vote. And that's why we think Judge Kaplan got it right. Thank you. Thank you. What we will do is we'll take about a five-minute break, and we'll come back, well, let's see, we'll come back at 4.30. We'll be out here at 5. Thank you. We'll have rebuttal. Mr. Lampkin. Can I ask you one of the things, and maybe you're not the one to deal with it, but if not, maybe Mr. Frederick can. How are you going to deal with the future claimants? How do you propose that be done? So, Your Honor, I think that for future claimants, that doesn't tell us what an answer to my fundamental pitch, which is, it doesn't tell us whether you should have JJCI in bankruptcy, or you should have... I agree. I agree. But the point is that if you don't have a bankruptcy, you're going to have an MDL process. And in an MDL process, how do you make sure that future claimants are dealt with fairly? Right. And I think in cases like the diet drugs cases, they did actually come up with a mechanism to deal with future claimants, because those cases also have a tail. There are ways of appointing people in order to represent future claimants and come up with a structured settlement that will handle it consistent with due process. But until we actually have a valid bankruptcy, we don't have a way of dealing with future claimants in bankruptcy. And I think that's really where I want to start with is, look, the difficulty here is we don't have a good faith bankruptcy in the first place, because the whole thing is structured to evade bankruptcy's principles. So if we undo the bankruptcy, what happens? How does this case go forward? There's two options there. One would be that J&J may decide, we're going to put all JJC on bankruptcy. And then we actually have, just like John's Mansfield, just like every other bankruptcy in history. How does that advance the ball for your clients? Well, it then advances the ball in multiple ways. First, when it comes to the priority rules, it means that equity doesn't get paid ahead of creditors here. It means that we don't sit in bankruptcy, literally dying, while billions of dollars go out to equity holders. Does the funding agreement address that concern? Actually, it doesn't. The funding agreement will increase the amount that's available to the amount that's paid to equity. But the absolute priority rule doesn't say, go ahead and pay equity as long as you have an unsecured promise to pay an equal amount to creditors later on. The absolute priority rule says, until you've satisfied your creditors, you don't give anything to equity, at least not without their consent, 75% of the court approval. And that is one of the reasons why it just fundamentally undermines the incentives here. Because J&J can operate its businesses as before, including all the aspects of old JJCI, outside bankruptcy, without bankruptcy court supervision, paying equity, paying other creditors. Well, one category of creditors sits in bankruptcy. And I think that's the critical thing is that you've actually taken one set of creditors, injured TALC victims, and put them in bankruptcy alone. Trade creditors get paid ahead of us. We're behind. And that is a fundamental distortion of the bankruptcy process. Since history, the way to do it is to just simply take your bankrupt company, if you're financially distressed, and put that company in bankruptcy. And I think the problem is that... But their point is that no claimant with a valid claim, fairly estimated, is going to be out of dollar. Now, there may be a significant delay if there is an appeal. But in the end, that full claim will be paid. Your Honor, first, I don't think the bankruptcy code says, you may follow my principles unless you give us an unsecured funding agreement that eventually may pay everybody. The bankruptcy code has structures that are meant to be followed. And if you've created your structure in order to evade those... I think what they're saying is that this is a case that's too generous. We're not talking about the next case. We're saying that with this, you are never, or perhaps almost never, ever going to get this kind of backstop again. Not only that, Your Honor, but if this goes forward, if J&J can do this, this is actually the model for the future. Who wouldn't do a build-your-own bankruptcy, where you choose, okay, which creditors I'm going to keep outside of bankruptcy and pay them right away? Which creditors I'm going to put in bankruptcy and make them wait? Which assets am I going to put outside bankruptcy? And which assets will I put in bankruptcy? Or will I just put an unsecured funding agreement subject to defenses, like if you fail to identify me, I can stop paying the funding? Those are dramatically different things. I think what they're saying is that, or the response to that would be, okay, the creditors that we paid before were because we hadn't gone into bankruptcy yet. Once we've gone into bankruptcy, those creditors, those claimants, are all going to be treated in a way in which there won't be as many strikeouts as there might otherwise be if there were litigation. So, Your Honor, to the extent that sometimes people prevail before juries and sometimes they don't, that's a function of the system that the framers established 200 years ago. We entrust the common man, 12 of them, to make these determinations and to find facts and make determinations. The notion that, well, bankruptcy might actually sort of even out the balance isn't a way of indicting the tort system that 50 states have operated to compensate victims for 200 years. But even setting that aside, that still doesn't answer the question of why LTL as opposed to JJCI, why not take the company that was the tort teaser that supposedly was in financial distress and put it and its assets into bankruptcy to satisfy it the way it's done before. And what we were told here is, well, the bankruptcy court looked at that and the bankruptcy court said, gee, that's going to be very costly. And I think the bankruptcy court said, it's too much value to waste. But when it comes to the bankruptcy code, it's not a waste to enforce the absolute priority rule so that people don't pay equity ahead of creditors. It's not a waste. To weigh around that, I mean, maybe it was just an offhand comment that Mr. Cotto made, but and I'm going to add on to it. Almost every right that's given to a creditor in bankruptcy, like who's secured, who's not, is something that's outside bankruptcy. Non-bankruptcy law tells you who has these particular rights inside of a bankruptcy, and that's basically following the Butner case from 79. Transpose that to the corporate area, that corporate law is not affected by the bankruptcy and corporate law allows for a divisional merger. And if corporate law allows that, so all that we are dealing, as you say, is just LTL itself, why is LTL not in some type of financial distress if that's the only one we're looking to and luckily has somebody who's willing to come to meet all of its funding needs with respect to the future of the bankruptcy? So Judge Ambrose, I think from the outset when we say we take the debtors, we find them, when you're describing, when you're deciding good faith under cases like the new debtor syndrome cases, courts ask who's my debtor, where did he come from, and why is he here? And the answer to those questions here is who's my debtor? It's an artificial entity created for bankruptcy. Why is he here? He's here so tout claimants will be in a single class by themselves in bankruptcy and everybody else is outside bankruptcy. Why is he here? He's here so that JJCI's assets, its operating business, is outside bankruptcy, beyond the bankruptcy court's reach, and only an unsecured funding agreement subject to defenses is available to tout claimants. That means that you don't just accept them as they find them when you have that sort of a purpose. And I think, Judge Ambrose, that actually distinguishes the Chapter 11 rundown cases you described. When you have a Chapter 11 rundown case, as I understand it, good co and bad co are both in bankruptcy, both subject to the court's supervision. This is the exact opposite. One company is in bankruptcy, such as the bankruptcy court's jurisdiction, but everything else that happens, all of old JJCI's assets that are operated, this spin-off, everything else that happens... What provisions of the code, if old JJCI were in bankruptcy, what provisions of the code do you think would apply that you would want to take into account with respect to old JJCI? The absolute priority to begin with, which is not a specific provision of the code, but it's an inflection from history and the structure of the code, where you don't pay creditors, you don't pay equity-added creditors. And that puts a lot of pressure on people to come up with a good plan to the benefit of creditors and not do what Bestwall is doing now and let things go for five years as people are rapidly failing. The second one would be... And I should have asked this before, spin out the absolute priority concept here. It's not like SGL, where they're going to do a state court, or a state dissolution, and have all the money go to equity after the bankruptcy. What monies are going to equity during the course of this bank? Are you saying dividends? Is that what you're talking about? Well, there's dividends and there's also $5 billion for a spin-off that was announced, or $5 billion for a stock buyback that was announced last week. And the fact that you can continuously, in bankruptcy, pay equity means that there's far less pressure to actually achieve a plan that the creditors can live with. You can wait longer and longer, just as Bestwall did. But I also point to Section 363, which is your non-targeted... When you say stock buyback, the stock buyback is not for LTL, the stock buyback is for OJJCI. Exactly. And a divisional merger was structured and a funding agreement is structured specifically to allow J&J to spin off assets without any of our creditors being able to do what they would be able to do under Section 363. If you had put the actual tortfeasor, the people funding this, OJJCI, into bankruptcy, which would be they get notice and an opportunity to be heard, and the bankruptcy court would be able to supervise it and to make sure that those assets are indeed available to the creditors at the end of the day. None of that exists, because instead of doing what one does ordinarily and putting the whole entity into bankruptcy, they've simply hived off one set of claims, put them into bankruptcy, and taken all the assets, all the operating things, all the famous brands, and operate them outside bankruptcy. And I think the key thing here is Javik makes it clear from the Supreme Court that it's just not permissible to say, I have provided something that I think is better for the creditors. When you're talking about the specific provisions of the code are important. And the code here ordinarily requires absolute priority rule, Section 363 supervision of spin offs and other non-ordinary course transactions. And even 524G requires that you put in equity securities, securities of the debtor with a right to dividends. But we've now swapped out one debtor, a valuable business, JJCI with famous brands, for a completely different debtor, which is LTL. And I'd like to sort of turn, if I could for a moment, to the injunction. I think the serious problem with injunction is this. Section 105 simply doesn't say you can reach out to non-debtors, 670 of them, and enjoin them on the basis of, gee, I think it has some relationship to the estate. You actually have to have a clear right to relief. What you're saying is that there's not an identity of interest other than the fact that it has the same corporate parent. Exactly, Your Honor. In fact, the record is very clear that you can't do this here because J&J has its own independent liability for its own tortious misconduct. For example, in Ingham, as we've mentioned, J&J had a higher multiple on punitive damages because, and I'll quote, because defendants' decision to chart their course of reprehensible conduct began long before JJCI was on office as a separate entity. J&J made all the health and safety decisions. It ignored its own scientists for decades on end. And actually, it worked tirelessly to make sure that industry standards would not change to make asbestos as otherwise undetectable detectable. That's on pages 716 to 717 of Ingham and pages 5841 to 592. And it personally, individually told, falsely advertised that baby powder does not contain asbestos and never will. And it tested every lot to make sure. And juries have repeatedly found J&J liable separately from JJCI. This is not a case of derivative liability. It is an instance of independent liability. For example, HFRE in California, 97.8% of the liability was given to J&J, not JJCI. If you look at the verdict sheets on page 45532, 4592, and there's a summary at 40704 and 4627, they are regularly giving more liability to J&J than JJCI. This is not a case of derivative liability where J&J, because it's the corporate parent, has some liability. This is J&J's ominous conduct. And when one is going to enjoin that type of liability, you need more than what the court came up with here. For example, and even 524G, if you want a channeling injunction. It says the channeling injunction in Combustion Engineering addresses the specific issue. 524G says when you have a channeling injunction, it applies only to the debtor. And you can go beyond the debtor when the liability is derivative because it comes from these corporate relationships. But the liability here isn't from corporate relationships. It's liability for J&J's own misconduct. And so you couldn't get a channeling injunction under 524G for the liability of J&J. Why under 105 on a preliminary basis are you going to give that injunction and prevent tout claimants from actually getting satisfaction when waiting for the possibility of a 524G plan? It simply doesn't make sense. It takes those statutory provisions and it sets them on their heads. And the net result is there's simply no ability of court claimants to come forward and have any ability to pursue a reasonable plan here because they're frozen in their tracks. J&J, it's got all the liability against it frozen. 650 other people, that's frozen. LTL are made for bankruptcy debtor, frozen as well. What is the leverage they have? Nothing. It simply shuts everything down. And you can't do that under 105. You can't do that under 362A when it is own independent liability. And there's a key provision here that I don't, a key finding by the district court that I don't think I heard Mr. Kochial mention. And it is this. The district court found, and this is again 159, that the shared identities of interest were based on allocation of agreements to the debtor. That means indemnification agreements that they had off and gave to the debtor, shared insurance agreements that they gave off to the debtor on the eve of bankruptcy, quote, for the very purpose of extending the stay. That is an effort to create equity through agreements on the eve of bankruptcy. And that doesn't work for two reasons. One is combustion engineering saying you can't buy agreement, establish jurisdiction. But it also doesn't work as a matter of equity. As a matter of equity, two parties can't enter into a contrivance, an agreement on the eve of bankruptcy and therefore say, aha, we now have a right to injure third parties and prevent them from pursuing other parties that have their own independent liability. Ultimately, the problem here is that J&J decided to take a corporate shell, LTL, and put it into bankruptcy. But then it turns around and says, now that we've put this corporate shell into bankruptcy, we want an injunction that protects not just the corporate shell, protects us from our own independent liability, that protects retailers from their own independent liability, that protects everybody from their own independent liability. But that's completely topsy-turvy. If we're going to accept putting LTL in bankruptcy, the automatic stay in any possible standard 105 would extend to just LTL. It wouldn't extend to everybody else. But we really shouldn't be saying we're going to accept LTL as our debtor here because the very purpose of putting LTL into bankruptcy was to make sure that TAL claimants were treated differently or were treated differently. I know one of the questions that came up here was, well, how do we determine? What if it was 1994 when they did the divisional merger? What happens if it was 1979? And I think the short answer is twofold. One is, in this case, it was two days before bankruptcy. In this case, we know exactly why it was done. It was done to manipulate the bankruptcy. It was done to make sure that it was structured in a way where JJCI would be out of bankruptcy and Berks Assets would be out of bankruptcy and only TAL claimants would be in bankruptcy. And that provides a very clear answer alone. So it's not just a matter of time. It's a matter of what the purpose was. If we look back and we have a non-bankruptcy purpose for years on end that says, yeah, we've established this as a meaningful way. We've not only given them liabilities. We've actually given them a business. And they're operating that business for years. And they're building up assets and goodwill. And it's a real company that's operating. That's a very different scenario from saying, we've now created a company solely for the purpose of bankruptcy. We've given it all the liabilities for just one set of claimants. And we've done it for the purpose of keeping certain assets out of bankruptcy. So we continue to pay dividends, continue to operate the brand, and continue to do so without the bankruptcy court supervision that would otherwise be. Indeed, what you just said, that's your principal theme, isn't it? That is my principal theme, Your Honor. I think that really sums up the problem here. And in addition, I think I should also stress that in the end, it can't be both is all right to put LTL in bankruptcy and then to extend the injunction to everybody else. If by definition, you just end up going way beyond all parties, the parties specified by 362, the normal under 105. Do you understand? Thank you, Your Honor. I appreciate that. If there's no further questions. No further questions. I know Mr. Frederick reserved some time. Mr. Janda, did you have anything further to say? I did not reserve any time, Your Honor. I'll give you two minutes. You want two minutes? It's your call. Thank you, Your Honor. Just three points I'd like to make real quickly. So first is, you know, I've heard a lot of talk today about what system, tort system or the MDL system or the bankruptcy system is better for which set of parties, current claimants, future claimants, defendants. And I think there's a very complicated, admittedly, balancing of interests of trying to get claims resolved efficiently, to get claims resolved correctly, to get claims resolved equitably, and to ensure that people are able to exercise the rights that they have, their constitutional rights, their due process rights, their jury trial rights. And that complicated balancing of interests has been done by Congress. Congress has enacted a number of different aggravation mechanisms and has enacted the bankruptcy code. But the bankruptcy code, Congress has enacted and provided strong tools to defendants only in a limited set of circumstances. As this court said, those strong tools invite abuse. And it's really up to the courts to police the boundaries of that system to ensure that it's not being used for reasons that Congress didn't intend to be used. And I don't think 524G changes the analysis in any way. 524G presupposes you have a valid bankruptcy. And Congress has determined that 524G provides an appropriate tool in bankruptcy, once you have a bankruptcy, to make sort of the best of a bad situation. But I don't think you can sort of bootstrap your way into bankruptcy to try and take advantage of the tool that presupposes a valid bankruptcy in the first place. Second, just very quickly on financial distress, I heard my friend on the other side say two things that I think together could resolve this case on their own. I mean, one is that he says LTL is the appropriate entity. And two is that in his view, or in LTL's view, the total legitimate value of all of the current and future tort claims against it is less than $61 billion, which it has access to under the funding agreement. You put those two things together, and I don't see how you can make any argument that there is a legitimate financial distress here on the part of the debtor that it justifies invoking bankruptcy, maybe ever, and certainly not at this point. And then third, just very briefly, as we said, bankruptcy provides a lot of tools. It's a very strong medicine. It curtails creditors' rights in significant ways, including allowing debtors to bind non-consenting creditors, possibly many, many non-consenting creditors to one particular resolution. And that is appropriate when you have a debtor facing financial distress that needs that time to reorganize its affairs or to pursue an orderly liquidation. But it's not appropriate every time you just have a lot of tort claims against an entity when those preconditions aren't met. And that's just the case here. Thank you very much. Thank you. Mr. Frederick, I know you reserved three minutes. We'll give you five. Since you're batting, clean up. Thank you very much, Your Honors. I want to start with the trilogy of Third Circuit cases because the main point made on the other side was that they didn't confront mass torts. But the SGL Carbon case in announcing why the good faith standard was so important had an extensive discussion of Johns Mansfield. And the point that it was making was that Johns Mansfield had tried for many, many years to pay off claimants until it got to a point where it did face imminent financial distress. There was no doubt that Johns Mansfield was in financial distress. And the question here is, is LTL in financial distress? Now, you can either take the fundamental contradiction of their position, which is the funding agreement will fund everything, in which case LTL is not in financial distress, or the funding agreement depends on Johnson & Johnson and JJCI, in which case this is not a proper bankruptcy purpose because those two entities are not in the bankruptcy. Either way, that contradiction should end the case on as a matter of good faith and the court need not go further in order to decide how far it needs to go. Now, the point is made that after Ingham, it's impossible to settle these cases. Our experts said 98% of asbestos cases settle or dismissed. The bankruptcy law professors who provided an amicus brief on their side said 97% of MDL cases settle or dismissed. Common sense tells you that you don't have to litigate all 38,000 to judgment. We weren't born yesterday. And that point made by the bankruptcy court is on its face not credible and is subject to plenary review by this court. Now, the main argument that they make for financial distress is based on the speculation that they're going to have to pay out many, many tens of billions of dollars. But SGL Carbon says you don't look at speculation for future. You look at what is imminently before you. Do you have a present inability to meet present financial obligations? And here, LTL unquestionably did that two days after it was created. There's no serious issue at the moment it had filed its bankruptcy. It was not facing financial distress. Importantly, Mr. Katyal does not deny that not a dime gets paid until the last appeal of the last objector has been resolved. And we know from judgments and settlements in the civil system that money has flowed. Johnson & Johnson shouldn't be permitted to stop that process. But the spinoff of JJCI, which is permitted and he acknowledges under the financing agreement, is what creates the cap. As soon as that cap is done, there is no greater value that can be done. And for that reason, their plan is not consistent with the statute 524G that says you have to have an evergreen source of continually growing assets and money to pay the future claimants. This plan undisputably does not do that. Now, he takes me to task for saying that Ingram was paid by Johnson & Johnson. Look at the appendix, page 6379. It was paid out of a central account. He eventually acknowledges that. The point is Johnson & Johnson charged back to JJCI as an accounting matter. Now, this wouldn't be, this might be important if JJCI had its own independent shareholders. It is a wholly owned subsidiary of Johnson & Johnson. But Johnson & Johnson wanted to be able to say that its continuing streak of paying higher dividends year after year has continued and so it bobbed off the accounting deficit to JJCI. I don't know why that should warrant good faith in a bankruptcy. Now, he says that there are real limiting principles here based on the facts. He talks about the latency. That's true for all asbestos cases, not just those that are created out of talc. And it is true of many mass torts as well. He says there's lottery style. But that's true in any case where there are really good lawyers who know how to try cases and there are really bad lawyers who don't know how to try cases. And you have the special problem of specific causation, which is evident, is an evident problem and issue in establishing the legitimacy of any person's claim. Their fundamental problem with their 524G is that they don't create an evergreen funding mechanism. And when he talks about the 79 transfer of liability, he doesn't respond that J&J itself was engaged in reprehensible conduct for which people have found them to be liable. Now, the last point I'd like to make is that Johnson & Johnson did not go to all this trouble in order to pay claimants more money. They went to this trouble to pay claimants less money more slowly. The civil system is designed with whatever flaws that it has to promptly move along cases and not to stop and stay all action. This particular bankruptcy is intended to benefit non-debtor affiliates. It is a litigation tactic to stop civil litigation. And there is no increase in value to the creditors, the tort claimants. And for all of those reasons, we urge you to reverse the bankruptcy court. Thank you very, very much. I would ask that a transcript be prepared of this oral argument and put the cost half this side, half that side. And I would also like to thank counsel for extremely well-presented arguments, not only today, but in your briefing. And also, I should broaden that to thank those who took time to write the amicus briefs. Very helpful on both sides. And we'll take the matter under advisement. Thank you. It's a privilege having you here. Thank you. Thank you.